STATE of Minnesota, Respondent,

v.

Gordon FRATZKE, Appellant.

No. C6–83–17.

Supreme Court of Minnesota.

Aug. 17, 1984.

C. Paul Jones, Public Defender, Susan K. Maki, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Janet A. Newberg, Sp. Asst. Atty. Gen., St. Paul, James A. Lavoie, Mille Lacs County Atty., Milaca, for respondent.

YETKA, Justice.

Defendant was tried and found guilty of first-degree murder and aggravated robbery in Mille Lacs County District Court. He was sentenced on the murder charge to life imprisonment. We affirm.

The only genuine issue at the trial was whether defendant was capable of acting with intent when he killed the victim. The defendant admitted at trial that he killed Hjalmer Westberg, and defense counsel conceded that the prosecution had proved every element of its case except intent. The defense strategy was to prove that defendant was too intoxicated on the night of February 17, 1982, to act with intent. Because of that defense, a rather detailed statement of the facts is necessary.

Defendant Gordon Fratzke was 27 years old on February 17, 1982. He testified that he started drinking alcohol at age 16 and that he had abused alcohol and other drugs continuously since that time. Defendant was put under 72-hour custody at alcohol detoxification facilities approximately ten times between 1974 and 1977 and was committed by the court to extended treatment programs on at least six occasions. He was involuntarily discharged from the Army because of alcohol and drug abuse.

February 17, 1982, was the day of the killing. On that date, defendant was living with Jeff Lucking in Foley, Minnesota. Sometime after noon, defendant and Lucking decided to drive to Mora in Lucking's pick-up truck to cut some wood. Before leaving Foley, defendant purchased an 8-pack of 8-ounce bottles of beer, which defendant and Lucking drank in the truck. On the way to Mora, they stopped and purchased another 6- or 12-pack of beer, which they also drank in the truck.

As the two men drove towards Mora, they passed Hjalmer Westberg's trailer home on Mille Lacs County Road 24. They noticed a junked automobile in the driveway and stopped to ask whether it was for sale. Defendant knocked on the door of the trailer, but no one answered. He and Lucking then noticed some firewood stacked outside the trailer and decided to steal some of it. They loaded the pick-up truck with wood and drove off.

Their next stop was the Beach Side Bar at Ann Lake. They tried unsuccessfully to

sell the stolen wood to the bartender and each drank two beers. Defendant then purchased a 12-pack of beer and they left the bar to go and visit Dean Moen, a friend of defendant's. Dean was not home so defendant and Lucking visited with Mrs. Moen and all three drank some beer out of the 12-pack. When Dean returned, they gave him a beer too. Then they sold the wood to him for $10 and left. Moen testified that he heard defendant state, "Boy, am I drunk." However, both Moen and Lucking testified that defendant did not appear to be intoxicated at that time.

After leaving the Moens, defendant and Lucking drove to Mora to visit Lucking's father. On the way to Mora, they smoked approximately three marijuana cigarettes. They stayed with Lucking's father for 15–20 minutes and shared one of their beers with him. They then went to see Lucking's brother Richard for a short time. After leaving Richard's house, they headed back to Foley.

On the way back to Foley, they again passed Hjalmer Westberg's residence. The lights were on in the trailer so they decided to stop and ask about the junked automobile. Westberg invited them in and asked them who they were and what they wanted. Defendant lied to Westberg about his residence, stating that he lived in Garrison. He actually resided in Foley, about 30 miles south of Garrison. The three men agreed on a price for the automobile and then Lucking asked Westberg if he would sell them $5 worth of firewood. Westberg agreed to do so, and they went outside to load the wood into Lucking's truck. Westberg indicated how much wood they could take, and Lucking and defendant loaded the wood.

After the wood was loaded, Lucking started counting out $5 to pay Westberg. He heard a "klunk" sound and looked up to see Westberg throw up his hands and fall to the ground. Defendant was standing behind Westberg, holding a piece of firewood in both hands, "holding it like a club or bat." Lucking shouted, "Gordon, what the hell did you do that for?" The defend-

ant told Lucking to shut up and not to mention his (defendant's) name. Defendant started loading the rest of the woodpile into Lucking's truck. Lucking was looking at Westberg and defendant said to him, "Don't just sit there, G___ d____ it. Start loading the f____ing wood." Lucking picked up a piece of wood and threw it into the truck. Defendant walked over to Westberg and started kicking him in the head. Lucking testified that defendant kicked Westberg four or five times "about as hard as you can kick." The force of the kicks was so great that it caused Westberg's whole body to move. Lucking shouted at defendant to stop, and he did. Defendant went back to loading wood. Lucking got into the truck and shouted, "I'm getting out of here." He saw defendant going through Westberg's pockets, then dragging him around behind the remains of the woodpile. After Westberg was behind the woodpile, Lucking saw defendant's head and back moving up and down as if he were hitting Westberg with his fists or pounding his head against the ground. Lucking started to drive away, and defendant ran and jumped into the truck.

According to Lucking's testimony, defendant was not exhibiting signs of obvious intoxication while they were at Westberg's property. He carried and loaded the wood without stumbling, although he did accidentally hit Lucking with one piece that he had thrown into the truck. He did not slip on the snow-covered ground and he was not staggering. Defendant did not deny any part of Lucking's testimony; his testimony was simply that he could not remember much of what had happened on the night of February 17. However, he did state that he remembered seeing Westberg lying on the ground and that he believes he did hit Westberg. In addition, he admitted under cross-examination that he killed Westberg.

As Lucking drove away, defendant started to pound on the dashboard of the truck and shout, "I'm a killer" or "I'm a killer again." He stated that Lucking was an "accessory to the fact." Defendant then

opened Westberg's wallet and divided the $14–$18 it contained with Lucking. When Lucking said that defendant had killed a person for $18 and some firewood, defendant responded, "Well, maybe he's better off dead. That way he can't say nothing." Defendant seemed to be thinking coherently as they drove away from the scene. He told Lucking to slow down because he was driving too fast. He noticed Westberg's driver's license and stated that he knew Westberg from a treatment program both had attended at Moose Lake State Hospital. He suggested that they return to Richard Lucking's house and try to sell him the wood. Finally, he made a point of instructing Lucking not to tell anyone about the crime so they would not be caught.

Richard Lucking testified that defendant and Jeff Lucking arrived at his house at about 9:00 p.m. and offered to sell him the wood. Richard wanted to see how "green" the wood was so they split a few pieces up to burn in Richard's stove. Defendant was able to handle a heavy splitting maul without incident. Richard testified that he knew defendant had been drinking by the smell on his breath, but defendant was not stumbling and was able to converse coherently without wandering off the subject of conversation. Richard also stated that Jeff related the story of the killing to him in private. The details did not differ from Jeff's version at the trial.

Hjalmer Westberg was 73 years old on the night he was killed. An autopsy revealed that his skull had been fractured in three places—across the back and at each temple. The medical examiner testified that the fractures were caused by multiple blows to the head. The force of the blows was sufficient to break several bone fragments loose and to flatten out the right side of Westberg's face.

Defendant was apprehended because Jeff Lucking turned himself in to the police and revealed defendant's role in the killing.

Defendant raises these issues on appeal:

1. Did the trial court err in denying a change of venue and refusing to record the voir dire examination of the jury?

2. Was the evidence sufficient to support the jury's finding that defendant had the capacity to act with intent when he killed Westberg?

3. Did the trial court err in excluding the opinion of an expert witness on defendant's capacity to "plan anything" on February 17?

4. Did the trial court err in admitting testimony concerning defendant's confession to an earlier murder?

5. Did the trial court err in refusing to instruct on third-degree murder?

6. Was defendant convicted of aggravated robbery in addition to first-degree murder?

1. The district court file contains 11 articles relating to this crime, published in local newspapers between approximately February 25, 1982, and July 28, 1982. On October 13, 1982, defense counsel moved for a change of venue, apparently on the basis of adverse newspaper publicity. The motion was denied by an order dated October 13, 1982. The order was issued without an accompanying memorandum.

Defendant now claims that the court's refusal to change venue violated his right to a fair trial. This court has stated that trial courts have wide discretion in deciding motions for change of venue. The trial court's decision will not be reversed "unless there has been a clear abuse of discretion." *State v. Salas*, 306 N.W.2d 832, 835 (Minn.1981) (quoting *State v. Gilbert*, 268 N.W.2d 576, 581 (Minn.1978)). The fact that a case generates widespread publicity does not require a trial court to grant a change of venue. What matters is whether the publicity is of a type that is prejudicial to the defendant and whether it affects the minds of the specific jurors involved in the case. *Id.* at 836.

Of the 11 newspaper articles related to this case, three do not mention defendant's name at all. Five more are concerned with the prosecutor's appeal from an unfavorable pretrial order and only mention de-

fendant's name as an indicted party. Thus, only three articles contain material that could be considered prejudicial. Two of these report on defendant's and Lucking's arrest and quote from a deposition filed by the county sheriff in support of the complaint. They relate Lucking's accusations against defendant, including Lucking's statements that defendant hit Westberg on the head with a piece of firewood and kicked him in the head. The third article reports on the two suspects' indictment and quotes from the indictment that defendant "caused Westberg's death."

The articles are not the type that would require the trial court to grant a change of venue. In *State v. Salas, supra,* this court indicated that publicity would be prejudicial if it quoted public officials' opinions concerning the defendant's guilt. 306 N.W.2d at 835. *See also State v. Thompson,* 266 Minn. 385, 123 N.W.2d 378 (1963): "The vice of the publicity given this case is not in printing or disseminating factual news but in printing and broadcasting what purports to be the opinions of people who are supposed to know the facts." *Id.* at 388, 123 N.W.2d at 381. The most damaging statements in the newspaper reports were all clearly ascribed to Lucking, who was identified as a co-defendant charged with the same crimes as defendant. Since no public officials were quoted, this publicity did not require a change of venue. The quote from the indictment cannot be considered prejudicial because it was a purely factual report. *See State v. Swain,* 269 N.W.2d 707, 720 (Minn.1978). It is also significant that these three reports were published over 7 months before the trial. This court has recognized the lapse of time as a factor in evaluating the prejudicial effect of pretrial publicity. *See State v. Hogan,* 297 Minn. 430, 437, 212 N.W.2d 664, 669 (1973) (3-month interval); *State v. Swain,* 269 N.W.2d 707, 720 (Minn.1978) (6-month interval). For these reasons, the trial court did not abuse its discretion in denying defendant's motion.

■ Defendant argues that the court's refusal to record the voir dire examination entitles him to a new trial. Defendant's argument is based on the premise that any irregularities in the voir dire would be concealed by the lack of a record. However, after voir dire in this case was completed, defendant's attorney was given a specific opportunity to make a record of his objections to any of the jurors. He did not make one comment. Therefore, defendant's argument requires the court to act on the basis of pure speculation. We decline to do so.

2. The only sufficiency of evidence question in this case concerns the finding that defendant had the capacity to act with intent. If defendant had capacity, the finding that he actually acted with intent to kill is justified by the manner in which Westberg was killed. Multiple blows were delivered with great force to very vulnerable parts of Westberg's body, for example, both "temple" areas of his skull. This court has stated that "the length and severe brutality" of a beating are sufficient to prove intent as an element of first-degree murder. *State v. Walker,* 306 Minn. 105, 120, 235 N.W.2d 810, 820 (1975).

■ Defendant argues that the evidence of capacity is inadequate as a matter of law because it is based solely on the uncorroborated testimony of an accomplice. This is simply wrong; the record contains several items of evidence that tend to corroborate Jeff Lucking's testimony. Defendant and Lucking visited Lucking's brother Richard shortly after the killing. Richard testified that defendant was able to handle a maul and split firewood and that defendant did not stumble as he walked. Defendant's mental condition was also described—he was able to stay on the topic of conversation without wandering and he was not confused. Dean Moen saw defendant before the killing, and he testified that defendant did not appear to be intoxicated. Finally, there was evidence that defendant had been capable of drinking two quarts of vodka per day in July or August of 1981. Defendant's expert acknowledged that this was far in excess of the amount of alcohol defendant consumed on February 17, 1982.

This court has indicated before that past history of alcohol consumption is relevant to the defense of intoxication. *State v. Marsyla*, 269 N.W.2d 2, 5 (Minn.1978) (defendant had a blood alcohol content of .20% at the time he killed three people. Fact that he had previously been apprehended while driving with .37% concentration supported a finding that he had capacity to act with intent at the time of the killing).[1]

■ Since there is other evidence indicating that defendant was capable of acting with intent, Lucking's testimony may be considered. It indicates that defendant was sufficiently clear-headed on the night of February 17 to attempt to conceal his identity: he lied to Westberg about his residence and told Lucking not to mention his name after he first struck Westberg. Defendant acted purposefully after he killed Westberg by loading the rest of the wood into the truck and going through Westberg's pockets to find his wallet. It was defendant's idea to sell the wood to Lucking's brother. Finally, defendant was capable of foresight and took steps to conceal the crime. He dragged the body to a hiding place and warned Lucking not to tell anyone about the killing. He stated that it was better for Westberg to be dead because that way he could not report the crime.

The question of whether defendant was too intoxicated to form an intent is one for the jury to answer. *Bangert v. State*, 282 N.W.2d 540, 545 (Minn.1979). If there is sufficient evidence to support the jury's conclusion on the intoxication issue, that conclusion will stand despite the existence of some contrary evidence. *State v. Wahlberg*, 296 N.W.2d 408, 416 (Minn.1980). The evidence in this case was adequate to support the verdict.

3. Defendant called Dr. Randawl Lakosky as an expert witness. Dr. Lakosky is a psychiatrist with a great deal of experience treating chemically dependent patients. Lakosky expressed his opinion that defendant was intoxicated on the night of the crime and that defendant was not fully able to exercise good judgment or self-control because of his long history of alcohol abuse. Defendant's counsel then asked Lakosky if he had "an opinion as to whether [defendant] could have planned or was planning anything" on the evening of February 17. The prosecutor's objection on the basis of relevance was sustained. Defendant's counsel did not make an offer of proof and closed the direct examination without further questions.

■ Defendant's failure to make an offer of proof precludes him from claiming error on this issue. Minn.R.Evid. 103(a)(2) (1982). However, had there been an offer of proof, we would still sustain the trial court's ruling.

In *State v. Bouwman*, 328 N.W.2d 703 (Minn.1982), defendant was charged with first-degree murder. The state asked the trial court to prohibit the defendant from examining his expert psychiatric witnesses on the issues of intent and premeditation. The court denied the state's motion, but certified the following question to this court:

> May the court admit, at the trial of a defendant charged with murder in the first degree, expert psychiatric opinion testimony (not offered to establish a defense under Minn.Stat. § 611.026) that the defendant, at the time of the alleged crime, lacked the mental capacity to premeditate the killings or to form the specific intent to kill?

1. There was evidence that defendant did not drink alcohol between late December 1981 and mid-February 1982. Defendant's expert testified that this "dry" period immediately before February 17 could have reduced his ability to drink large amounts of alcohol. However, the expert never offered an opinion about how much defendant's tolerance would be decreased; his testimony was in very general terms. This court is required to review the evidence "in the light most favorable to the state." *State v. Thompson*, 273 Minn. 1, 36, 139 N.W.2d 490, 515, *cert. denied*, 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966). Therefore, the evidence of defendant's drinking capacity corroborates Jeff Lucking's testimony that defendant was able to act with intent.

*Id.* at 704–05. This court answered the certified question "in the negative." It held that intent is primarily a question of fact for the jury to decide on the basis of their experiences in life and common sense. Expert testimony on capacity could only be admitted when a defendant raised the insanity defense.

Thus, *Bouwman* is dispositive in this case. It might be argued that this case is distinguishable because the defendant in *Bouwman* did not claim that his capacity was reduced because of intoxication. The average juror has some experience with intoxication and is presumably able to consider the effect of alcohol consumption on the ability to act with intent. Mental illness is a specialized field where expert knowledge and experience are required. Therefore, it is within the court's discretion to admit expert testimony regarding the effect of insanity on mental capacity in phase II of a bifurcated trial. The exclusion of this evidence was not reversible error. *See State v. Bouwman,* 354 N.W.2d 1 (1984).

4. Jeff Lucking testified that, as he and defendant were driving away from the scene of Westberg's death, defendant admitted to another killing on an earlier date. Lucking testified that defendant said, "Don't worry about it. They never caught me for the last one seven years ago." Defendant's attorney immediately asked for a conference at the bench, and it is obvious that he objected at that time on the basis of relevance and undue prejudice.

The statement showed defendant's capacity to act intentionally. It demonstrates that he was thinking clearly immediately after the killing, aware of the gravity of his act and its potential consequences. Given the broad definition of relevance contained in Minn.R.Evid. 401 (1982), the trial court properly overruled defendant's relevance objection.

■ Defendant also argued that the probative value of this evidence was outweighed by the possibility that it would unduly prejudice the jury. Minn.R.Evid. 403 (1982). However, we do not·need to consider whether the trial court balanced these two factors properly because any error in admitting the evidence was harmless. We have stated that the doctrine of harmless error is applicable to cases where prejudicial evidence was erroneously admitted. *State v. Dinneen,* 300 Minn. 354, 358–59, 220 N.W.2d 292, 295 (1974); *State v. Wofford,* 262 Minn. 112, 120, 114 N.W.2d 267, 272 (1962). The standard for establishing harmless error is demanding—the error will only be disregarded "if there is no reasonable possibility that the evidence complained of might have contributed to the conviction," or when defendant's guilt was "conclusively proven." *State v. Paige,* 256 N.W.2d 298, 302 (Minn.1977); *State v. Hutchison,* 121 Minn. 405, 409, 141 N.W. 483, 484 (1913).

■ As noted above, the issue in this case was whether defendant was capable of acting with intent when he killed Westberg. There was a great deal of evidence to support the state's argument that he was capable: Jeff Lucking's testimony about statements made after the crime, Moen's testimony about defendant's demeanor before the crime, Richard Lucking's testimony about defendant's demeanor and capacity for physical activity immediately after the crime, and evidence indicating his ability to consume large quantities of alcohol. Defendant was not able to rebut any of this evidence. The only evidence he offered to. prove his lack of capacity was the opinion of one expert witness to the effect that he was "intoxicated" on the night of the crime and that his 6-week "dry" period preceding the crime could have reduced his tolerance for alcohol.

In some cases, it is difficult to decide when there is sufficient evidence to prove conclusively that a defendant is guilty, but the evidence in this case is overwhelming. Therefore, defendant is not entitled to·a new trial on the basis of the trial court's admission of his confession to an earlier crime.

■ 5. *State v. Wahlberg,* 296 N.W.2d 408 (Minn.1980), is dispositive of this issue.

In *Wahlberg,* essentially the same facts were presented as exist in this case. Defendant was accused of killing Jeffrey Goedderz. Goedderz died as a result of multiple blows with an ax and a knife, and defendant was intoxicated at the time of the murder. After a jury trial, defendant was convicted of first-degree murder. On appeal, he contended that the trial court erred in refusing to instruct the jury on third-degree murder.

We held that the refusal to instruct was not error. We defined the circumstances where a third-degree murder instruction would be indicated:

> This statute was intended to cover cases where the reckless or wanton acts of the accused were committed without special regard to their effect on any particular person or persons; the act must be committed without a special design upon the particular person or persons with whose murder the accused is charged.

*Id.* at 417 (citations omitted). Applying this test to the facts of the present case, it is clear from the manner of death that defendant's actions were directed towards the person of Hjalmer Westberg. Thus, no third-degree murder instruction was required.

6. Defendant claims that he was convicted of aggravated robbery in addition to first-degree murder. He argues that the robbery conviction must be vacated under Minn.Stat. § 609.04 (1982) which provides that:

> Upon prosecution for a crime, the actor may be convicted of either the crime charged or an included offense, but not both. An included offense may be * * *:
>
> (4) A crime necessarily proved if the crime charged were proved * * *.

Defendant was convicted of first-degree murder under the felony-murder section of the statute. The felony at issue was the aggravated robbery of Hjalmer Westberg. Therefore, under section 609.04, defendant cannot be convicted of both aggravated robbery and felony murder because aggravated robbery is an offense "necessarily proved" if the felony-murder charge is proved.

The crux of this issue is the definition of "conviction." The term is not defined in the statute, but it was recently considered by the court. In *State v. LaTourelle,* 343 N.W.2d 277 (Minn.1984), defendant was convicted on three counts of first-degree murder. He argued that, under section 609.04, only one conviction could be sustained. The court agreed, but it did not require that the other convictions be vacated outright. Instead, it held that only one conviction could be *adjudicated.* The other two were allowed to stand, but had to remain unadjudicated. *LaTourelle* defines "conviction" as "adjudicated conviction" for section 609.04 purposes.

An adjudication of conviction is defined in Rule 27.03, subd. 7, Minn.R.Crim.P. (1982): "The sentence or stay of imposition of sentence is an adjudication of guilt." In this case, defendant was only sentenced for first-degree murder. There was no sentence or stay of imposition of sentence on the aggravated robbery charge—that charge was never mentioned in the trial court's sentencing order. Since the aggravated robbery conviction was never adjudicated, defendant's argument that it must be vacated is without merit.

The trial court is upheld and the conviction is affirmed.