STATE of Minnesota, Respondent,

v.

Daniel Edward NAYLOR, Appellant.

No. C1–90–1501.

Supreme Court of Minnesota.

Aug. 23, 1991.

Rehearing Granted Oct. 21, 1991.

John M. Stuart, State Public Defender and Susan K. Maki, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Robert A. Stanich, Sp. Asst. Atty. Gen., St. Paul, and Raymond F. Schmitz, Olmsted County Atty., Rochester, for respondent.

## OPINION

GARDEBRING, Justice.

Defendant Daniel Edward Naylor was convicted of first degree murder and second degree murder under an accomplice liability charge in the death of Wayne Lange; the second degree murder conviction was vacated by the trial court. Naylor was also convicted of the use of drugs to injure or facilitate a crime; the trial court

imposed a prison sentence for that offense to run concurrently with Naylor's mandatory life sentence for first degree murder.

Naylor contends that a variety of errors by the trial court deprived him of a fair trial, and therefore, he is entitled to a new trial on the charges against him. The errors alleged are:

1) admission of prejudicial evidence of Naylor's involvement with and interest in witchcraft and satanism;

2) admission of testimony by a co-defendant that Naylor had told her he had committed an earlier murder;

3) improper reference by the prosecutor in closing argument to Naylor's decision not to testify on his own behalf.

On these issues, we find that no error requiring a new trial occurred at Naylor's trial.

Naylor also urges us to vacate his sentence for the crime of use of drugs to injure or facilitate a crime. We vacate the sentence because Naylor's conduct constituting that offense was indivisible from his conduct as an actor or accomplice in committing first degree murder.

Naylor, the victim Wayne Lange, and the co-defendants Lyle McIntyre, Cindy Blomgren, Jennifer Keller, Michelle Toche, and David Duncan, along with other young people, formed an apparently close-knit social "family," involving a number of shifting platonic and romantic relationships. They lived together at several locations in Rochester, Minnesota, including in a house owned by Sandra Mollitor. Within the group, Lange was regarded as a troublemaker, thought to be interfering with the relationships of the others and suspected both of being a police informant and of stealing from the others.

Evidence was introduced at trial suggesting that members of the group were interested in satanism and witchcraft, had bought and read books about these subjects, and that both Naylor and Lange had described themselves as warlocks. During the week before Lange's murder, the three women co-defendants and Naylor discussed performing a Halloween prank "warlock test" on Lange, a mock ceremony in which they would remove Lange's clothes and leave him outdoors at night to embarrass him.

On Saturday, October 28, 1989, one of the group bought Naylor a dagger of a kind called a boot knife. After receiving the knife, Naylor showed it to Blomgren, describing it as his "new toy." Later that night, Toche, Duncan, McIntyre, Blomgren and Keller, along with Lange and Naylor, went to a party where Lange was drugged with amitriptyline sleeping pills and rendered unconscious for a time. At the same party, Naylor became involved in a fight, during which he displayed the newly acquired dagger. Very early on the morning of October 29th, all seven left the party in Blomgren's car and drove out into the country.

Stopping at a farm field near Eyota, Naylor began arguing with and punching Lange. Then Naylor pulled out his dagger and slashed Lange across the neck. Naylor continued attacking Lange after he fell to the ground. When Lange was dead, Naylor asked Duncan's help in removing Lange's outer clothing.

After Lange was killed, the others left, with Naylor telling the five co-defendants that, if asked, they should describe the evening's events accurately up to the time at which they left the party. Naylor directed the others to say that Lange was dropped off at the Mollitor house after the party and that no one saw him after that. Naylor threatened to harm anyone who deviated from this story.

Naylor and McIntyre went to a place called the Farm at about 4:30 a.m. on October 29th, looking for a friend of Naylor's. A resident of the Farm, Laura Dornack, answered the door and spoke with Naylor. Naylor told her that he had killed Lange and asked her to smell the blood on his hands. Naylor showed Dornack the bloody clothes removed from Lange's body and mentioned the other individuals who had been present at Lange's murder. He said they planned the preceding night to drug Lange and then kill him, and that he killed Lange by slashing his throat and stabbing

him in the chest. Dornack noticed blood on the left knee of Naylor's pants. Naylor and McIntyre then drove to a bridge over the Zumbro River where they pitched Naylor's shoes and Lange's shoes into the water. Later they went to McIntyre's house, where McIntyre noticed blood on appellant's pants.

Lange's body was discovered at about 10:00 a.m. on October 29th and the Olmsted County coroner promptly began an investigation into the death. No identification was found on Lange's body or at the crime scene. Lange had been punched in the face, then slashed across the neck at least three times. He was also stabbed in the chest, cutting one of the pulmonary arteries, using a double-edged dagger about an inch from edge to edge and at least five inches in length. Lange's abdomen was scored with long, shallow slashes, both front and back, requiring turning the body after it received the fatal wounds. An X was incised shallowly in Lange's neck and a dagger shoved through the center of the X into a vertebra. Toxicology studies showed that Lange had alcohol and amitriptyline in his blood.

Early news reports of the discovery of the unidentified body described it only as a white male dressed in a T-shirt and undershorts. By the evening police were concerned that no one had come forward to identify the body, so they released information about distinctive tattoos on the body. After hearing these broadcasts, several members of the group, including Naylor, went to the Law Enforcement Center to identify Lange. At that time, Naylor, McIntyre, and Duncan made separate statements that Lange had been with them at the party. The next morning, on October 30th, an anonymous caller told police about Naylor's visit to Laura Dornack the previous day. After police interviewed Dornack, arrest warrants were issued for Naylor and the five co-defendants.

While in the Olmsted county jail, the six co-defendants were held separately from one another. Initially, the co-defendants stated they had left Lange at the Mollitor house after the party and did not see him again. However, in the next few days five of the co-defendants made statements describing the circumstances of Lange's death and saying that Naylor had instructed them as to their alibis. They also indicated how Lange was drugged before the party and how Naylor had disposed of Lange's clothing, his own clothing, the murder weapon, and other items of physical evidence. They also described the plan to perform a "warlock test" on Lange to embarrass him.

A variety of physical evidence was assembled by police. Pants seized from Naylor had a trace of human blood that could not be matched to a particular person. Naylor's dagger, which matched the shape and size of wounds on Lange's body, was seized from Blomgren's grandparents' house after the arrest of the accomplices. A shoe identified as Naylor's was found in the Zumbro River, along with Lange's shoes.

The five co-defendants and Naylor were indicted for murder in the first degree; the five had testified without any offer of immunity at Naylor's grand jury. Later, the five co-defendants pleaded guilty to lesser felony charges and were sentenced to prison. Numerous other witnesses testified in a lengthy trial that followed extensive voir dire.

Naylor now appeals, asking for reversal of his murder conviction on various independent grounds and for vacation of his sentence for using drugs to facilitate the commission of a crime.

I. Evidence of Witchcraft Involvement

Naylor seeks a new trial claiming that evidence of his involvement in witchcraft was so unfairly prejudicial that its admission denied him a fair trial. Trial court decisions on the admission of evidence are reviewed under an abuse of discretion standard that is deferential to the trial court ruling. *State v. Kelly,* 435 N.W.2d 807, 813 (Minn.1989). A ruling is prejudicial and therefore reversible if there is a reasonable possibility the error complained of may have contributed to the conviction. *Id.; State v. Fratzke,* 354 N.W.2d 402, 409

(Minn.1984). In other words, this court will reverse when there is any reasonable doubt the result would have been different had the evidence not been admitted. *State v. Blasus*, 445 N.W.2d 535, 540 (Minn.1989).

Under Rule 403, relevant evidence *"may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."* Minn.R.Evid. 403 (emphasis added). We review a trial court's decision to admit relevant evidence in two steps: first, we review the trial court's weighing of the substantiality of prejudice of the evidence under an abuse of discretion standard and, second, if there was an abuse of discretion, we determine whether there is a reasonable possibility the erroneously admitted evidence may have reasonably contributed to the jury's verdict of guilty.

Naylor objects to three types of evidence of his involvement in witchcraft: testimony by various witnesses about Naylor's interest in witchcraft and satanism, photographs of the covers of books about witchcraft seized from the co-defendants, and the books themselves. On appeal, Naylor does not challenge the relevancy of this evidence, but we note that evidence relating to Naylor's involvement with witchcraft and satanism appears to be relevant as a link to the ritualistic aspects of the killing and as an explanation for the planning of a "warlock test" of Lange. It further provides an explanation for the testimony of the co-defendants that they were afraid of Naylor.

### A. Testimony About Witchcraft Involvement

■ Each of the co-defendants was questioned by the state about Naylor's involvement in witchcraft, despite what Naylor characterizes in his brief as a continuing objection. Naylor's trial counsel referred to such a continuing objection on relevancy grounds near the conclusion of the trial, but no specific objection was raised when testimony about witchcraft involvement began. Naylor discussed his interest in witchcraft with Jennifer Keller and told her that he was a warlock. Naylor likewise described himself as a warlock to Cynthia Blomgren in early 1989 and to David Duncan in October 1989. Toche, Blomgren, Jennifer Keller, and another, non-accomplice, witness testified that Naylor described himself as a warlock or satanic high priest at various times, and Jennifer Keller also testified that she discussed books on witchcraft with Naylor.

Naylor properly objected to the testimony of later witnesses about his witchcraft involvement but he has made no showing that evidence linking him to witchcraft or satanism would result in unfair prejudice and substantially outweigh the probative value of such evidence. The trial court's ruling admitting the testimony of Naylor's admissions of witchcraft and satanism involvement did not abuse the discretion granted the trial court under Rule 403.

### B. Photographs of Witchcraft Books

■ Before the police seized books about witchcraft from Blomgren's car and Mollitor's home, they took photographs of the books in place. These photographs were admitted as evidence to establish the presence of the books in places accessible to all of the accomplices. The photographs show only the covers of the books and would appear to have no prejudicial effect from their cover art. The photographs are probative of Naylor's participation in the research process that went into planning the warlock test to embarrass Lange and confirm the testimony that Naylor, and not the women co-defendant's alone, had access to and interest in the books. The trial court's ruling admission of the photographs of the books was not an abuse of discretion.

### C. The Seized Books

■ In executing search warrants at the homes and cars of the accomplice witnesses, police seized several books on witchcraft after hearing of possible witchcraft involvement in Lange's death. The books were all identified on exhibit lists disclosed to Naylor's counsel before trial. Over Naylor's timely objection and after lengthy bench and chambers conferences, twelve of the books were admitted as evidence in

Naylor's trial and were accessible to the jury during deliberations.

There is no per se rule barring admission of books to juries in criminal trials. *State v. Hogan*, 297 Minn. 430, 433, 212 N.W.2d 664, 667 (1973) (approving, in attempted murder trial, admission of books on "urban guerilla warfare" seized from defendant); *cf. State v. Herberg*, 324 N.W.2d 346, 347 (Minn.1982) (noting link between contents of violent pornographic books offered as state's exhibits and circumstances of charged crimes in a case settled before trial by a plea bargain). Admitting a book into evidence at trial, however, allows the jury access to the entire contents of the book, even though only a small portion of the book is relevant for finding material facts in the case. Because a book may contain much irrelevant and even potentially prejudicial material, the proponent of a book as an exhibit has a particular obligation to be familiar with its contents before offering it as evidence. Therefore, we have carefully examined each of the twelve books admitted into evidence in this case.

The books admitted in this case have little additional relevance beyond that of the testimonial evidence and photographic evidence of Naylor's involvement in witchcraft. On the other hand, eleven of the twelve books admitted have little, if any, prejudicial effect because they are designed to depict witchcraft and satanism favorably. Most of the books make witchcraft look innocuous and acceptable and would not be unfairly prejudicial when read by a jury from the same community in which the books were apparently purchased at a family bookstore. Given their modest relevance, when weighed in the Rule 403 balancing test, eleven of the books come within the zone in which the trial court could have exercised discretion to exclude them; however, admitting these eleven books was not an abuse of discretion.

The twelfth book admitted, however, poses a more difficult problem. State's Exhibit 85, *Satanism: Is Your Family Safe?*, was owned by one of the accomplices, who was not sure if others

had seen it. The book has a striking cover photograph of a man in a priestly robe holding a dagger, a dagger which is similar to that owned by Naylor and thought to have been used in the killing. As its title suggests, the book takes an antiwitchcraft, antisatanism position in reporting various allegations about witchcraft and satanism in the United States. The book suggests that crimes committed by "witches" sometimes remain unsolved because prosecutors are reluctant to charge crimes that include possibly unbelievable details of witchcraft involvement. The book, extraordinarily, includes a specific charge to jurors, "So long as jurors shy away from convicting people with alleged satanic connections, such atrocities will continue."

It is legitimate for the state to provide explanations for the sometimes inexplicable phenomena of violent crime. Damage to the opponent's case that results from the legitimate probative force of the evidence is fair game for both sides in a criminal trial, which is an effort at truth-finding. *See State v. Axford*, 417 N.W.2d 88, 92 n. 1 (Minn.1988). It becomes persuasion by illegitimate means, however, to suggest that people with long-term involvement in witchcraft are necessarily persons with ghastly criminal records and that jurors ought to put such people away. *Satanism: Is Your Family Safe?* makes such a suggestion to its readers.

As to any of the other books, their unfair prejudicial effect is minimal because the intent of their authors is to make readers *less* prejudiced toward witchcraft after reading the books than before. But the authors of *Satanism: Is Your Family Safe?*, in their concern for unknown victims of satanic crimes, explicitly desire to have juries take witchcraft evidence negatively into account during criminal trials. The state concedes in this case that admitting the books about witchcraft without giving the jury limiting instructions resulted in "potential for prejudice." We conclude that the trial court abused its discretion in the admission of Exhibit 85.

As to whether the error was harmless, the test is whether there is any rea-

sonable doubt the result would have been different if the evidence had not been admitted. *Blasus,* 445 N.W.2d at 540. There was considerable evidence apart from these books tending to show that Naylor was guilty of first-degree murder as a primary actor, and even more evidence showing his guilt as an accomplice among the group of co-defendants. That evidence consisted of admissions by Naylor to nonaccomplices before his arrest, the direct testimony of five accomplices, the additional testimony of other nonaccomplices regarding Naylor's enmity toward Lange, the physical evidence linking Naylor to the crime scene and manner of Lange's death, and the lack of a convincing explanation of Naylor's whereabouts during Lange's murder. The jury was correctly instructed on accomplice liability for first degree murder in this case and on the need for corroborating evidence in addition to the accomplice testimony. After reviewing the entire extensive trial file, we conclude that the jury would have decided exactly the same way had the erroneously admitted book not been admitted; under the *Blasus* test, the error in admitting this evidence is harmless.

Nonetheless, we caution prosecutors and trial court judges to be especially meticulous in their review of books and documentary exhibits before such exhibits are admitted into evidence. While, in this case, the overwhelming nature of the evidence against Naylor outweighs the prejudicial impact of the provocative language of Exhibit 85, another case might be closer. Prosecutors should avoid putting at risk the fairness of a trial in a serious criminal matter by seeking the admission of such marginally relevant, cumulative and inflammatory material.

## II. Other Crime Evidence

■ Naylor seeks a new trial on the ground that testimony, including Naylor's admission of involvement in an earlier murder, denied him a fair trial, even after the trial court instructed the jury to disregard the testimony. When prejudicial evidence is erroneously admitted, the harmless error doctrine is applied in appellate review. *Fratzke,* 354 N.W.2d at 409.

The following exchange occurred during the state's case in chief, on direct examination of Toche about events immediately following Lange's murder:

State: Who turned on the dome light?

Toche: Dan did.

State: What did he do?

Toche: He held his hands up, and he said, "Do you know what this is?" And nobody said anything. And he goes, "This is death." And then he made a comment that he didn't think he could do it that way.

State: What else did he say?

Toche: And he said this was the second time he had done it.

Naylor's statement was an admission and thus may not be excluded on hearsay grounds. The statement was offered for its effect on the hearer, Toche, and to explain why she had initially made false statements to the police until she was sure that Naylor could not harm her. As our decision in *State v. Fratzke,* 354 N.W.2d 402 (Minn.1984) demonstrates, Minn. R.Evid. 403 provides the appropriate analytical framework for determining the admissibility of this statement.

■ Rather than wait until the final charge to the jury to instruct the jurors to disregard Toche's testimony about Naylor's admission, the trial court gave Naylor and his counsel an opportunity to draft an immediate instruction to the jury, which the trial court read to the jury later the same day that Toche testified. Thus this evidence of Naylor's involvement in an earlier crime was never admitted, because the jury was instructed to disregard it. Therefore, we are not constrained to hold that error in admitting evidence occurred as to this testimony. Even if this evidence had been erroneously admitted, the *State v. Fratzke,* 354

N.W.2d 402 (Minn.1984) holding would deny Naylor a new trial. *Fratzke* applied the harmless error analysis to a remarkably similar admission contained in co-defendant testimony that was not excluded at Fratzke's trial. *Id.* at 409. Because of the strength of the evidence in Naylor's case, if error had occurred on this point it would have been harmless.

### III. Comment in Closing Argument

 Naylor asks for a new trial on the ground that the state during closing argument improperly commented on his decision not to testify on his own behalf, and that the curative instruction was not given until the final charge to the jury. Adverse comment on the defendant's election not to testify is per se reversible error when the comment is extensive, when an inference of guilt from silence is stressed to the jury as a basis of conviction, and when there is evidence that could have supported acquittal. *Anderson v. Nelson,* 390 U.S. 523, 523–24, 88 S.Ct. 1133, 1134, 20 L.Ed.2d 81 (1968). When these factors are not present, such comment is subject to harmless error review. *State v. Spencer,* 311 Minn. 222, 248 N.W.2d 915 (1976); *cf. Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967) (dictum) (establishing harmless error rule in comparable cases but reversing conviction on facts of Chapman's case).

The first step in analysis is characterizing the state's comment in closing argument. The state's closing argument ended with these remarks:

> Just look at those elements and you can resolve this—you're not going to resolve every single issue that is hanging in this case. In fact, as some of the witnesses said, "I'm telling the truth and the defendant knows the truth." We're never going to know exactly what happened out there. But you certainly have enough evidence before you to find the defendant guilty of first-degree murder having premeditated with the intent to kill Wayne Lange on the 29th of October of 1989. And I ask you to come back with a verdict of guilty in this case. Thank you.

Naylor characterizes this remark as an adverse comment on his election not to testify on his own behalf. The state characterizes the comment as a summation of Lyle McIntyre's testimony during cross-examination. Even if we characterize the comment as Naylor would have us do, it is certainly neither extensive, stressed to the jury as a basis for conviction, nor part of a case in which there is evidence that could have supported acquittal on the charge of being an accomplice to first degree murder. Thus, harmless error analysis would apply, and for the reasons stated above the error, if any, is harmless.

 We are especially reluctant to characterize the comment as error because the jury was instructed in the trial court's final charge not to draw any adverse inference from Naylor's election not to testify. In this case, we see no reason the trial court should have been required to give the curative instruction immediately after the comment was made, as Naylor has argued, rather than in the final charge to the jury. *See State v. Race,* 383 N.W.2d 656, 664 (Minn.1986) (holding prosecutorial error is curable by final instructions).

### IV. Overall Effect of Alleged Errors

 We have independently considered whether the overall effect of all the errors alleged by Naylor might have denied him a fair trial. We are satisfied that the great bulk of evidence to which there was no objection at trial amply establishes Naylor's guilt as an accomplice in the first degree murder of Lange. We note that the final instructions to the jury by the trial court stressed the elements of the charged offenses all related to Lange, not to other unknown victims, which would reduce any tendency on the part of the jury to convict Naylor for Lange's murder because it believed he had committed other bad acts. The jury was specifically instructed to presume Naylor innocent during its deliberations, and to draw no adverse inferences from his election not to testify. Therefore, we conclude that there was no cumulative

prejudicial effect from the alleged errors that might have denied Naylor a fair trial.

### V. Conviction of Drug Offense

█ Naylor asks this court to apply Minn.Stat. § 609.035 (1990) to vacate his conviction for the use of drugs to injure or facilitate the commission of a crime if we affirm his conviction for first degree murder. Section 609.035 provides that, with certain enumerated exceptions, "if a person's conduct constitutes more than one offense under the laws of this state, the person may be punished for only one of the offenses and a conviction or acquittal of any one of them is a bar to prosecution for any other of them." Our cases applying Minn.Stat. § 609.035 examine the facts relating to the conduct of a defendant convicted of multiple offenses to determine whether the convictions indeed arose from "conduct [that] constitutes more than one offense" or whether they arose from a divisible series of incidents. *State v. Krampotich*, 282 Minn. 182, 187, 163 N.W.2d 772, 776 (1968). Although this factual distinction is not easily made on the record of most criminal convictions, in Naylor's case it appears to us that the jury found that Naylor carried out a single criminal objective in first drugging and later participating in the stabbing of Lange. Under *State v. Johnson*, 273 Minn. 394, 404, 141 N.W.2d 517, 525 (1966), when separate charges arise from such a single criminal objective, conviction of multiple offenses is not permitted. We distinguish *State v. Stevenson*, 286 N.W.2d 719, 720 (Minn.1979) as a case in which a single criminal objective was achieved in the first charged offense, and then an identical criminal objective was achieved against the same victim a few hours later. Naylor, by contrast, could reasonably be found to have drugged Lange as a preparatory stage in a plan to assault or murder Lange. We therefore vacate the concurrent sentence of imprisonment imposed on Naylor because of his conviction for use of drugs to injure or facilitate crime.

Affirmed; sentence vacated in part.

TOMLJANOVICH, dissents and files an opinion.

TOMLJANOVICH, Justice (dissenting).

I disagree with the majority that it was harmless error to permit the jury to take the book *Satanism, Is Your Family Safe?* to the jury room during its deliberations.

The defendant is alleged to practice Satanism and the title of the book alone suggests to jurors that he is a threat to themselves and their families. Further, this title is emblazoned across a cover with a "striking * * * photograph of a man in a priestly robe holding a dagger" similar to that allegedly used by defendant. It is clearly error to permit a jury, while pondering the fate of an alleged "warlock" to have access to a book stating, "So long as jurors shy away from convicting people with alleged satanic connections, such atrocities will continue."

Trial judges must exercise extreme caution in preventing jury access to such highly prejudicial material. Because this book could well have created fear and prejudice, it may have affected the jury's decision to find defendant guilty and to find him guilty of first degree murder. The error committed by the trial court was therefore anything but harmless. I would reverse the convictions and remand the case for a new trial.