529 N.W.2d 387 (1995)
STATE of Minnesota, Respondent,
v.
Jim DILLON, Appellant.
No. C3-94-1248.
Court of Appeals of Minnesota.
March 21, 1995.
*389 Hubert H. Humphrey, III, Atty. Gen., James P. Spencer, Asst. Atty. Gen., St. Paul, Raymond F. Schmitz, Olmsted County Atty., Rochester, for respondent.
Melissa V. Sheridan, Asst. State Public Defender, St. Paul, for appellant.
Considered and decided by NORTON, P.J., PARKER and SCHUMACHER, JJ.

OPINION
PARKER, Judge.
The state filed a complaint charging appellant Jim Dillon with three counts of selling and aiding the sale of a controlled substance. See Minn.Stats. §§ 152.021, subd. 1(1); 152.022, subd. 1(1); 609.05. A jury convicted him on two first-degree counts and one second-degree count. He appeals from the judgment of conviction and from the order of forfeiture of bail and restitution to the drug task force. We affirm the conviction and order of forfeiture of bail, but reverse the restitution order.

FACTS
The controlled substance charges against appellant Jim Dillon arose from three separate transactions during which he allegedly sold or aided in the sale of cocaine to undercover police informant Timothy White. The state alleged that Dillon sold cocaine directly to White on one occasion and sold it through a middleman, Anthony LeMon, on two prior occasions.
White was a paid civilian informant supervised by police officer Bob Schei. White testified at the jury trial that he became acquainted with Dillon while drinking at a local bar. He told Dillon that he wanted to purchase cocaine. Dillon replied that he might be able to locate a source for cocaine, but was not sure. When they left the bar, White observed that Dillon and his girlfriend, Juliann Lenfesty, drove a "distinctive" black Chevrolet pickup truck. He informed officer Schei that he had established contact with a potential cocaine supplier.
White had been previously acquainted with Anthony LeMon. He testified that LeMon approached him four days later and offered to sell cocaine to him. LeMon told White that "his man" would deliver the cocaine to his residence at 5:30 the next day and that White could meet him there to purchase it. White agreed and conveyed this information to officer Schei. The next day, Schei met with White at a prearranged location and searched him for money and controlled substances. He then provided White with $510 and a monitoring device.
White drove to LeMon's residence at 5:30. He testified that he observed the distinctive black pickup truck that belonged to Dillon and Lenfesty parked in LeMon's driveway (at the time, White knew Dillon and Lenfesty only as "Jim" and "Julie"). He entered the house and observed Jim and Julie seated at the dining room table. LeMon told White "there was no longer a quarter-ounce available, only an eight-ball." White handed LeMon $225, and LeMon told him that he needed an additional 15 minutes. White left the house and drove to a nearby gas station, where Officer Schei debriefed him.
*390 During White's absence, a surveillance officer observed two persons exit LeMon's residence and drive in the black pickup truck to the address of Jim Dillon. The officer ran a license check and learned the truck was registered to Juliann Lenfesty. The officer testified that White returned ten minutes later. White entered LeMon's house and observed a bag containing white powder on the dining room table. LeMon told him, "there it is," and White took possession of what was later determined to be 3.1 grams of powder containing cocaine. Before leaving, he told LeMon that he wanted to purchase an additional one-half ounce or ounce of cocaine as soon as possible.
LeMon telephoned White four days later and said that he could provide one-half an ounce of cocaine. LeMon arranged the transaction: White would give LeMon $950; LeMon would walk to "Jim's" house to deliver the money; Jim would obtain the cocaine from "his guy;" Jim would deliver it to LeMon's house; and White would receive it at LeMon's house. White conveyed this information to Schei, who searched him and provided him with $950 and a monitoring device.
White testified that the transaction proceeded according to LeMon's arrangements. The surveilling officer observed LeMon walk to Dillon's residence and then return. He observed two persons (one of whom he identified as Lenfesty) drive in the pickup truck to a shopping center parking lot. They met briefly with the occupant of a vehicle registered to Dennis White, who was known to police as a suspected drug supplier. They returned to Dillon's residence, parked the truck, and walked to LeMon's residence.
White had persuaded LeMon to allow him to wait in a bedroom. He left the bedroom door ajar and testified that he observed Jim Dillon and Juliann Lenfesty enter LeMon's dining room. He heard Dillon tell LeMon that "his man" was worried that they were being watched. Dillon left the house. White emerged from the bedroom and LeMon gave him 11.4 grams of powder containing cocaine.
White telephoned Dillon six days later and arranged to purchase one-half an ounce of cocaine directly from him. Dillon invited White to his house. Officer Schei searched White and provided him with $1,000 and a monitoring device. White testified that, while inside Dillon's house, Dillon removed a bag of powder from a wooden cigar box and weighed it. He told White that he "wished I coulda gave you that deal like I did last time." White counted the money and exchanged it for 13.8 grams of powder containing cocaine.
Police obtained a search warrant and executed a search eight days later. They seized two bags of marijuana from Dillon's bedroom and one bag of marijuana from a jacket located in the dining room. The police also seized books entitled Drugs From A to Z: A Dictionary, and Drugs and Solutions. They did not find cocaine, plastic bags, a wooden cigar box, or a scale. The trial court admitted the marijuana and books into evidence. The court also admitted evidence of LeMon's plea of guilty to charges of cocaine trafficking and allowed in-court identification of LeMon dressed in prison clothing.
During opening and closing arguments, the prosecutor argued that Dillon was involved in a "drug distribution network." He also referred to threats allegedly made by Dillon to White, stating "this is a dangerous organization," and referred to a "Cuban connection." The jury convicted Dillon on all counts. Following trial, the court ordered forfeiture of Dillon's $5,000 cash bond for failing a chemical test and thereby violating an agreed-upon condition of release. The court also ordered Dillon to reimburse $3,175 to the drug task force, representing the money furnished to White to purchase cocaine.

ISSUES
I. Did the trial court abuse discretion (a) by admitting evidence of the accomplice's guilty plea; (b) by permitting in-court identification of the accomplice dressed in prison clothing; or (c) by admitting into evidence books and marijuana seized from Dillon's residence?
II. Did the prosecutor commit reversible misconduct by misconstruing the evidence during arguments to the jury?
*391 III. Was the evidence sufficient for the jury to convict Dillon for selling and aiding the sale of a controlled substance?
IV. Did the trial court err by ordering the forfeiture of Dillon's cash bail for violation of a condition of release?
V. Did the trial court err by ordering Dillon to pay restitution to the drug task force?

DISCUSSION

I. Admission of Evidence
Rulings on evidentiary matters are within the trial court's discretion. Caldwell v. State, 347 N.W.2d 824, 826 (Minn.App. 1984). When reviewing the court's decision to admit relevant evidence, we first ask whether the court abused discretion in weighing the potentiality for prejudice. State v. Naylor, 474 N.W.2d 314, 319 (Minn. 1991). If there was an abuse of discretion, we ask whether there is a reasonable possibility that the erroneously admitted evidence contributed to the jury's guilty verdict. Id.

A. Accomplice's Guilty Plea

Dillon contends the trial court abused discretion by admitting evidence of Anthony LeMon's guilty plea. The state maintains that defense counsel failed to preserve this issue by not properly objecting. The prosecutor asked officer Schei "what has happened" to Jose Rabano (who is incarcerated for his involvement with Dillon and LeMon). The court sustained defense counsel's relevancy objection prior to Schei's response. The prosecutor then asked, "what has happened * * *," at which point defense counsel, anticipating the question, interposed another objection.
The trial court allowed the prosecutor to finish his question, and Schei responded that LeMon was incarcerated after pleading guilty to "trafficking-in-cocaine charges." The prosecutor had provided notice of his intent to elicit evidence of the convictions of Dillon's accomplices. It is evident from that notice and from the preceding question that defense counsel anticipated the question and raised an objection to prevent the elicitation of potentially prejudicial testimony. The timing of counsel's objection was appropriate under the circumstances, and the trial court should have ruled upon the objection when the question was completed.
Evidence of a guilty plea of an accomplice of the accused is not admissible to prove the guilt of the accused. State v. Cermak, 365 N.W.2d 243, 247 (Minn.1985). Such evidence is not probative of the accused's guilt and may give rise to the prejudicial inference that, because the accomplice is guilty, so is the accused. The state argues that while LeMon's guilty plea may not be relevant to prove Dillon's guilt, "it is certainly relevant to proving LeMon's." LeMon's guilt, however, was not at issue. A jury may convict for aiding a crime "although the person who directly committed it has not been convicted." Minn.Stat. § 609.05, subd. 4 (1992). It was an abuse of discretion for the trial court to allow evidence of LeMon's guilty plea.

B. In-Court Identification

The trial court granted the prosecutor's request to allow White to identify LeMon in court dressed in navy blue prison pajamas with orange slippers. Two prison deputies escorted him as he stood between the jury box and the bench. Defense counsel objected to this procedure and offered to stipulate to the identification, but the prosecutor refused, stating that he wanted the jury to "attach a face to the name" and identify the "conduit between Tim White and Jim Dillon."
There is scant relevance to this identification procedure, since LeMon did not testify and his identity was not at issue. The prosecutor's purpose in identifying LeMon and his refusal to stipulate reflect an attempt to engage in dubious trial tactics. Furthermore, nothing in the record indicates that the trial court balanced probative value against the potential for unfair prejudice. See Minn. R.Evid. 403. It was an abuse of discretion for the trial court to allow this potentially prejudicial in-court identification without weighing the likelihood of prejudice.

*392 C. Admission of Books and Marijuana

Dillon challenges the use made of two books seized from his residence entitled Drugs From A to Z: A Dictionary, and Drugs and Solutions. The prosecutor offered the books to show that Dillon had potential access to knowledge of how to "cut" cocaine in preparation for sale. It is unclear whether the books contained such information. Nevertheless, the books were identified only by title and not offered as exhibits or examined by the jury.
Had the books been offered to the jury, the prosecutor would have been obliged to be familiar with the contents to avoid introducing irrelevant and potentially prejudicial information. Naylor, 474 N.W.2d at 319. Due to the limited reference to the books at trial, and because Dillon has not demonstrated prejudice by admission of the book titles, the trial court did not abuse discretion by ruling the books probative of Dillon's access to knowledge of cocaine.
Dillon also challenges the admission of marijuana seized from his residence. The prosecutor offered the marijuana as "probative of someone who consumes and distributes controlled substances." This is not a permissible purpose for admission, since evidence of other wrongs is not admissible in a criminal trial "to prove the character of a person in order to show action in conformity therewith." Minn.R.Evid. 404(b).
The trial court did not state the reason for admission. The court may have, in exercising the outer boundaries of discretion, admitted the marijuana to show Dillon's knowledge of sources for obtaining controlled substances. See id. This is not evident from the record. The record also does not show that the trial court provided the jury with a cautionary instruction. In addition, the prosecutor referred to the marijuana during closing argument. The court erred by admitting the marijuana for the prosecutor's improper purpose of proving character.

II. Prosecutorial Misconduct
The trial court's decision to deny a new trial based on prosecutorial misconduct will not be reversed unless the misconduct appears to be "so serious and prejudicial that defendant's right to a fair trial was denied." State v. Wahlberg, 296 N.W.2d 408, 420 (Minn.1980) (citations omitted). When reviewing a prosecutor's argument to the jury, even if the "argument is in some respects out-of-bounds," the misconduct is harmless unless it played a substantial part in influencing the jury to convict. State v. Walsh, 495 N.W.2d 602, 607 (Minn.1993).
Dillon challenges the prosecutor's statements during opening and closing argument that Dillon was involved in a "drug distribution network."[1] Argument to the jury must be limited to the facts of the case and reasonable inferences from those facts. State v. Richardson, 514 N.W.2d 573, 576 (Minn.App.1994). The prosecutor's statement is supported by police testimony that, based on their investigation, cocaine was supplied by Jose Rabano, who sold it to Dennis White, who sold it to Dillon, who in turn sold it to Anthony LeMon.
Dillon challenges the prosecutor's statement during closing argument that "this is a dangerous organization." The statement was based on White's testimony that he accepted a collect telephone call from the Olmsted County Jail during which Dillon allegedly told him that "some of the boys would be around to see [him] real soon." Evidence of threats is relevant to show consciousness of guilt. State v. Harris, 521 N.W.2d 348, 353 (Minn.1994). The prosecutor's remark is relevant as a permissible inference based on White's testimony.
Dillon also challenges the prosecutor's statement during closing argument that Jose Rabano supplied cocaine as part of a "Cuban connection." This is an impermissible inference and is potentially prejudicial. Officer Schei testified that Jose Rabano supplied Dennis White with cocaine. Dennis *393 White rented his Rochester residence from Rabano. Although there is testimony that Rabano is a "Cuban male," there is no evidence from which to infer the origin of the cocaine or whether the participants in this case are involved in an international cocaine network, as the testimony implies.

III. Sufficiency of the Evidence
Reversal of Dillon's convictions is warranted if there is a reasonable possibility that the erroneously admitted evidence contributed to the jury's guilty verdict. Naylor, 474 N.W.2d at 319. This determination is dependent upon the sufficiency of evidence presented at trial. Our review on appeal must consist of a "painstaking analysis of the record to determine whether the evidence" was sufficient to permit the jurors to reach their conclusion. State v. Webb, 440 N.W.2d 426, 430 (Minn.1989).
We view the evidence in the light most favorable to the verdict and assume "the jury believed the state's witnesses and disbelieved any evidence to the contrary." State v. Moore, 438 N.W.2d 101, 108 (Minn. 1989) (citation omitted). We will not disturb the verdict if a jury could reasonably have concluded that the state proved the defendant guilty beyond a reasonable doubt. State v. Alton, 432 N.W.2d 754, 756 (Minn. 1988).
The jury convicted Dillon on two counts of aiding in the sale of cocaine to Timothy White. White purchased 3.1 grams of powder containing cocaine during the initial transaction. It is a second-degree controlled-substance crime to sell unlawfully three or more grams of a mixture containing cocaine. Minn.Stat. § 152.022, subd. 1(1) (1992). A person is liable for the crime of another if
the person intentionally aids, advises, hires, counsels, or conspires with, or otherwise procures the other to commit the crime.
Minn.Stat. § 609.05, subd. 1 (1992). Presence, companionship, and conduct before and after the offense are circumstances from which participation in another's crime may be inferred. In re Welfare of D.K.K., 410 N.W.2d 76, 77 (Minn.App.1987).
The following evidence supports the jury's conviction on the first count: Dillon initially told White that he could possibly procure cocaine; White then observed him drive a "distinctive" black pickup truck; White saw the same truck parked outside LeMon's house on the date of the transaction and during the precise time when LeMon had stated that "his man" would deliver cocaine to his house; upon entering the house, White saw Dillon seated at the dining room table; LeMon took money from White in Dillon's presence; a surveillance officer saw Dillon leave and did not report seeing another person arrive; White returned ten minutes later and observed cocaine on the table at which Dillon had been seated.
The evidence is, as the state concedes, almost entirely circumstantial. Convictions based on circumstantial evidence "must point unerringly to the accused's guilt." State v. Scharmer, 501 N.W.2d 620, 621-22 (Minn.1993) (citation omitted). It is nevertheless entitled to the same weight as direct evidence if the circumstances proved are inconsistent with any rational hypothesis except that of the accused's guilt. State v. Race, 383 N.W.2d 656, 661 (Minn.1986). The above evidence, buttressed by Dillon's conduct at the two subsequent transactions, admits no rational conclusion but that Dillon had participated in selling cocaine to White during the initial transaction.
The jury also convicted Dillon of aiding the next sale to White of 11.4 grams of powder containing cocaine, a first-degree controlled-substance crime. Minn.Stat. § 152.021, subd. 1(1) (1992). The following evidence supports this conviction: LeMon arranged for White to purchase the cocaine from "Jim"; Jim Dillon had been present four days earlier during the initial cocaine transaction; LeMon arranged to deliver White's money to Jim's house, and Jim was to deliver the cocaine to LeMon's house; a surveillance officer observed LeMon walk to Jim Dillon's house and then observed two persons (one of whom he identified as Dillon's girlfriend) meet with a suspected cocaine supplier at a shopping mall.
*394 The officer observed these people return to Dillon's residence in the distinctive black pickup truck, then walk to LeMon's house. White observed Dillon enter LeMon's house and heard him say "his man" was worried that they were being watched. Immediately after Dillon left, LeMon gave White the cocaine. In addition, the jury heard a tape-recorded conversation between White and Dillon during the final transaction. Dillon told White that he wished he could have given him "the deal like I did the last time." Much of the evidence is circumstantial, yet it points to only one rational conclusion: that Dillon supplied LeMon with the cocaine that he sold to White during the second transaction.
The jury also convicted Dillon of directly selling 13.8 grams of powder containing cocaine to White. This is a first-degree controlled-substance crime. Minn.Stat. § 152.021, subd. 1(1) (1992). White testified that Dillon invited him to his residence to purchase cocaine. Officer Schei searched White for money and cocaine before he entered Dillon's house. He provided White with marked money and a recording device. White emerged with the cocaine and without the money. In addition, the jury heard a recorded conversation between Dillon and White during which Dillon refers to a "deal," an "eight-ball," and "five grams."
Dillon challenges White's credibility and asserts that his "motive to lie was powerful," and defense counsel elicited testimony tending to impeach White. The jury must resolve questions involving credibility. State v. Lanam, 459 N.W.2d 656, 660 (Minn.1990), cert. denied, 498 U.S. 1033, 111 S.Ct. 693, 112 L.Ed.2d 684 (1991). There is consistent testimony by the informant and several police officers that Dillon participated in the sale of cocaine. The investigative techniques employed by the police were careful, controlled, and well-documented. In addition to the circumstantial evidence, there was direct testimony and recorded conversations implicating Dillon. We believe there is sufficient evidence to sustain a conviction on each transaction. When viewed in context, each transaction lends color and shape to the others. We conclude there is overwhelming evidence to support convictions on all counts.
We feel a duty, however, to caution the trial court and the prosecution. Prosecutors have an obligation to safeguard the rights of the accused and to avoid making improper arguments. State v. Salitros, 499 N.W.2d 815, 817 (Minn.1993). The trial court must keep counsel within bounds and ensure that the case is decided on the basis of relevant evidence. Id. Had the evidence gathered by the police not been so strongly probative of guilt, reversal of these convictions might have been required.

IV. Forfeiture of Bail
Dillon agreed, as a condition of his release, to submit to periodic urinalyses and to refrain from chemical use. He signed a waiver of extradition stating that failure to comply with this condition may be ground for forfeiture of his $5,000 cash bond. Defense counsel stated to the court that he understood that bail is subject to forfeiture. Dillon later tested positive twice for the use of cannabis. At the sentencing hearing, the court ordered him to forfeit bail based on violations of a release condition.[2]
Dillon argues that forfeiture of bail is authorized only if the defendant fails to appear in court when ordered. Trial courts must set bail according to standards relevant to assuring the defendant's presence. Stack v. Boyle, 342 U.S. 1, 4-5, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1963). In addition, courts have discretion to impose conditions of release "which will reasonably assure the appearance of the person for trial or hearing." Minn. R.Crim.P. 6.02, subd. 1.
So long as the conditions of release are pertinent to the offense charged and to assuring the defendant's presence, nothing prohibits the defendant from agreeing to forfeiture for violation of a condition upon his pretrial release. Dillon breached a condition agreed upon in return for his release, *395 and the court had discretion to order forfeiture pursuant to the agreement. Use of unlawful substances jeopardizes the assurance of defendant's appearance in court, and the condition was pertinent to the purpose of bail.

V. Restitution to Drug Task Force
The trial court ordered Dillon to pay $3,175 to the Southeastern Minnesota Drug Task Force as restitution for money expended to purchase the cocaine. A victim of a crime has the right to receive restitution. Minn.Stat. § 611A.04, subd. 1(a) (1992). The statute defines a "victim" for purposes of restitution as either a natural person or a corporation that incurs loss as a result of crime. Id. § 611A.01(b).
The Southeastern Minnesota Drug Task Force is a police agency. The task force does not qualify either as a natural person or as a corporation for purposes of statutory restitution. The legislature must mandate any broader entitlement to restitution:
[T]he word "restitution" connotes restoring or compensating the victim for his loss. If the legislature intended the term to be used more loosely, as a form of punitive damages, it should have used some other word or made its particular use of the word clearer.
State v. Fader, 358 N.W.2d 42, 48 (Minn. 1984). See also State v. Harwell, 515 N.W.2d 105, 110 (Minn.App.1994) (ruling that Missing Children's Fund is not a "victim" entitled to restitution), pet. for rev. denied (Minn. June 15, 1994). We reverse the trial court's order for restitution to the drug task force.

VI. Appellant's Pro Se Brief
Dillon submitted a pro se supplemental brief challenging the admission and sufficiency of the evidence. As previously discussed, we conclude there is sufficient evidence to sustain the jury's verdicts, and there is no reasonable possibility that the erroneously admitted evidence contributed to the verdicts. Dillon also claims that police unlawfully seized additional cash, documents and photos. A careful search of the record does not reveal evidentiary support for these claims.

DECISION
Affirmed in part and reversed in part.
NOTES
[1] The state argues that defense counsel failed to preserve this issue by not properly objecting. Counsel asked to approach the bench and expressed concern about the "hearsay nature and relevance" of the testimony. The court responded, "objection overruled." The trial court treated defense counsel's concerns as an objection, thus the issue is properly preserved for appeal.
[2] Dillon has not advanced a claim that forfeiture of bail for violation of a release condition should have been accomplished by a contempt-of-court proceeding. Consequently, we do not address the issue.