STATE of Minnesota, Respondent,

v.

Mark John ALTON, Appellant.

No. C4–87–1823.

Supreme Court of Minnesota.

Dec. 9, 1988.

C. Paul Jones, State Public Defender, Elizabeth B. Davies, Deputy State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Tom Foley, Ramsey Co. Atty., Steven C. DeCoster, Asst. Co. Atty., St. Paul, for respondent.

## OPINION

SIMONETT, Justice.

Defendant appeals his conviction for first degree murder, claiming that premeditation is lacking as a matter of law and that the trial court erred in admitting certain photographs of the murder victim's body. We affirm.

Defendant Mark John Alton had lived with his girlfriend, Philomena Bifulk, and her three children from a previous marriage from September 1984 to October 1986. In June 1986 the couple rented a house at 627 East Jessamine in St. Paul and both signed the 1–year lease.

In September 1986, Bifulk became romantically involved with Robert Carley and broke off her relationship with defendant. Alton moved out of the house in October, leaving several of his possessions behind, including a VCR and waterbed which had been jointly purchased by the couple. Carley moved in with Bifulk in November. Bifulk and Carley planned to be married on April 18, 1987.

Defendant continued to have contact with Bifulk; he visited her at the Tom Thumb Store where she worked and called her on the phone. In November 1986, defendant removed some speakers from Bifulk's car. In their place he left a note saying Bifulk had made a lot of mistakes the last few months, she would have to suffer the consequences of her mistakes, and he had no control over what his brother or father might do.

On March 10, 1987, 15 days before the murder, defendant visited Bifulk at the Tom Thumb Store. Bifulk testified that defendant threatened her, saying Carley would be a dead man before her wedding came.

On the morning of March 25, 1987, Carley drove Bifulk to work at 5:20 a.m. Around 9:00 a.m. Bifulk received a call from defendant. She testified that he asked to meet her because he had something urgent for her to read. She told him to come over immediately but he said he could not make it until 1:00 p.m. They agreed to meet then.

Carley returned to the store between 8:15 and 9:00 a.m. and then went to breakfast with his father and brother. He returned to the Tom Thumb around 10:15. During this visit he tried to call an attorney representing his father. The attorney's receptionist logged Carley's call at 10:45 a.m. After leaving this message, Carley left the Tom Thumb for home.

Around 12:15 p.m. defendant again called Bifulk at the store. Bifulk testified defendant said he had just done something devastating and terrible, his life was definitely over now, and he loved her. Between 1:00 and 1:30 p.m., Philomena's sister, who was staying with her temporarily, returned to 627 Jessamine with her boyfriend. When they entered the house they discovered Carley's body on the floor. The sister immediately called the police.

Sergeant Laurence Johns of the St. Paul Police Department videotaped the crime scene. This videotape, narrated by Johns, was shown to the jury. There were signs of struggle in the room. The table was tipped over or broken, a chair was tipped over, a pair of glasses was found on the floor, and a wall hanging was lying on the floor. One of the windows was broken from the outside, and broken glass was found under the couch. A .22–caliber semiautomatic rifle was lying on the sofa with a pink towel draped over it. The rifle had been purchased by defendant from a K–Mart in St. Paul on March 20, 1987.

Several shell casings were found throughout the living room and dining area. One live round was also found in the dining area. One of the casings, labeled No. 7 by the State, had a crimp on its side. Police officer Mark Johnston testified that in his experience such a crimp would be caused by a weapon jamming. Rifles of .22 caliber have a dirty type of powder that can build up and cause jamming when the gun is fired repeatedly. To clear the rifle, the bolt has to be manually drawn back and the spent casing cleared by hand. If the bolt were drawn back more than once, a live round could be released. This would explain the presence of the live round next to the crimped casing. James Gag, a firearms expert, determined that one of the expended bullets found at the scene and one of the bullets removed from Carley's body had sufficiently detailed microscopic markings that they could be positively identified as having been fired from the rifle on the sofa.

The medical examiner, Dr. Michael McGee, observed seven entrance bullet wounds—two to the head, three to the chest, one to the left arm, and one to the abdomen—and one exit wound on the right side of the chest. Dr. McGee also observed an oval-shaped bruise above and below the right ear, caused, in his opinion, by a blow from the butt of the rifle administered with great force. Dr. McGee testified as to his theory concerning the order in which the wounds were inflicted. He thought that Carley was shot with at least two separate volleys. The first wound was to the abdomen. The next three wounds were to the chest. These wounds would cause Carley to fall to the ground. The final two wounds were to the head. Dr. McGee testified that due to the presence of powder

around the first wound to the head, it was likely that the muzzle was held only inches away from the skin. The second wound to the head had a crescent of abrasion and hemorrhaging around it which suggested to Dr. McGee that the muzzle made direct contact with the skin.

When Bifulk was permitted to reenter the house, she discovered several items missing. The wedding rings belonging to Carley and her had been taken from the upstairs bedroom. Carley's jacket, checkbook, and car were also missing. Bifulk also found a Pepsi can on the headboard of her bed, two empty Pepsi cans in the kitchen trash, a Player Light cigarette butt in an ashtray in the dining room, six to eight Player Light cigarette butts in her car, and a Player Light cigarette package in the kitchen trash. Bifulk's sister was the only person in the household who drank Pepsi and she denied having left a Pepsi can on the headboard. Bifulk testified that Carley only smoked Marlboro's and defendant smoked Player Lights because he was trying to quit.

On March 26, 1987, the day after the murder, Bifulk received a wedding RSVP in the mail. It read: "Name: Mr. Mark Alton. Number of persons attending: One. Ha-ha." On the back of the RSVP was written, "I don't make threats, Phil, I make promises. You took away my future, now I took yours! Paybacks are a mother-fucker. Have a good life. Take care. I love you, Mark." The card was postmarked March 25, 1987.

Defendant was arrested in Dresser, Wisconsin, on March 26, 1987. At the time of his arrest, defendant was driving Carley's car and had Carley's checkbook in his pocket. A rifle was lying on the back seat of the car. Defendant had purchased this second rifle from a K–Mart in Stillwater on March 25 at 11:35 a.m., using Carley's identification and check.

## I.

On appeal, Alton argues that, as a matter of law, the evidence of the shooting death with a rifle purchased at a K–Mart store only 5 days before was insufficient to show premeditated murder under Minn. Stat. § 609.185(1) (1986). In reviewing the sufficiency of the evidence, this court makes a painstaking review of the record to determine if the evidence is sufficient to permit the jury to reach the conclusion that it did. *State v. Richardson,* 393 N.W.2d 657, 661 (Minn.1986). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that a defendant was proven guilty of the offense charged. *State v. McCullum,* 289 N.W.2d 89 (Minn. 1979). Where a conviction is based on circumstantial evidence, the verdict will be sustained on appeal when the reasonable inferences from such evidence are consistent only with defendant's guilt and inconsistent with any rational hypothesis except that of guilt. *State v. Threinen,* 328 N.W. 2d 154, 156 (Minn.1983).

Minn.Stat. § 609.18 (1986) defines premeditation as follows: "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Premeditation must usually be inferred from all of the circumstances surrounding the homicide. Extensive planning and calculated deliberation need not be shown; the plan to commit first degree murder can be formulated virtually instantaneously. *State v. Wahlberg,* 296 N.W.2d 408, 415 (Minn.1980).

The evidence presented by the state is essentially uncontradicted because defendant did not testify or call any witnesses on his behalf. The following evidence supports a finding of premeditation:

(1) *Threats.* Bifulk testified that Alton had threatened her twice. In November 1986 Alton wrote Bifulk a note saying that she had made mistakes, now she had to suffer the consequences of them. Then 15 days before the murder, on March 10, 1987, Alton told Bifulk that her fiance would be a dead man before the wedding day.

(2) *Arming himself.* Defendant purchased a rifle from K–Mart 5 days before the murder.

(3) *Lying in wait.* The six to eight cigarette butts and three empty Pepsi cans found in the house suggest that Alton was at the residence for some time. During his stay he had time to take the wedding rings and remove an RSVP card from a wedding invitation. The evidence suggests that Alton did not have time to smoke the cigarettes or drink the Pepsis after the killing because the killing occurred in St. Paul sometime after 10:45 a.m. and before 11:35 a.m., the time at which Alton purchased a second rifle from the K–Mart in Stillwater, some miles away.

(4) *The method of killing.* Defendant fired seven shots into the victim. The testimony of Dr. McGee and Mark Johnston indicated that defendant had fired at least two separate volleys and that the two head wounds were inflicted at a very close range. Moreover, to inflict the rifle blow to Carley's head, Alton had to move toward him.

(5) *Completion of plan.* Alton sent the RSVP card to Bifulk: "I don't make threats, Phil, I make promises. * * *" The jury could reasonably conclude that Alton had followed through on his promise that Carley would be a dead man before the wedding.

While any one of the facts may be insufficient to show premeditation, taken as a whole, a jury could reasonably find premeditation beyond a reasonable doubt.

Defendant argues that there was no evidence of time between shots and that mere evidence of a series of shots or blows is insufficient to show premeditation. *State v. Richardson*, 393 N.W.2d 657 (Minn. 1986). There is evidence, however, of a time period between shots. Officer Johnston testified that the gun had jammed and Alton would have had to pull the bolt back manually to unjam it. Both Officer Johnston and Doctor McGee were of the opinion that there had been at least two separate volleys.

Defendant's alternative hypothesis that he went to the house without premeditation to collect his belongings does not follow from the evidence. Alton did not collect any of his belongings, such as the VCR,

while he was there smoking six to eight cigarettes and drinking three cans of Pepsi.

Defendant compares the present case to *State v. Swain*, 269 N.W.2d 707 (Minn. 1978), where the court found insufficient evidence of premeditation to sustain a first degree murder conviction. In that case, however, the only evidence of premeditation the state produced was that defendant had threatened the victim 10 months before, that the murderer had attacked from behind, and that there were repeated blows to the victim's head. *Id.* at 713. In the present case, there is far more evidence of premeditation. Defendant threatened to kill only 15 days before the murder; he purchased a gun 5 days before the murder; he indicated that he did not make threats, he made promises (that he impliedly kept); he fired seven shots in at least two separate volleys with a break in between to unjam the rifle; and the final two shots were fired with the muzzle of the rifle at the victim's head.

## II.

Defendant claims it was reversible error for the trial court to allow the admission of nine photographs of the crime scene and victim's body because they were prejudicial, inflammatory, and cumulative to the videotape. At trial, the photographic evidence consisted of the following: a 25–minute color videotape of the scene of the crime; 22 still color photographs of the crime scene, including 6 photographs of the victim's body; and 6 color autopsy photographs of the victim's wounds. Defendant objected to three of the 22 photographs of the crime scene, Exhibits 8, 10, and 11, which were admitted. Defendant also objected to all six of the autopsy photographs, Exhibits 59, 60, 61, 62, 63, and 64, which were also admitted.

The admission of photographs is in the discretion of the trial judge. *State v. Daniels*, 361 N.W.2d 819, 828 (Minn.1985); *State v. Hines*, 148 Minn. 393, 397, 182 N.W. 450, 451 (1921). The standard for admission of photographs was set out in *State v. DeZeler*, 230 Minn. 39, 46–47, 41 N.W.2d 313, 319 (1950):

Photographs are admissible as competent evidence where they *accurately* portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice. This is the general rule, and any other would be an anachronism in this day when pictures are a common and recognized medium for the accurate portrayal of objects and events.

We find that the trial court did not abuse its discretion in admitting the photographs. The trial court properly determined that each of the photographs was relevant and not cumulative to the videotape or the other photographs. In particular, since the state was trying to establish premeditation by the pattern of shots, the photographs helped to illustrate Dr. McGee's testimony regarding the path of each bullet.

AFFIRMED.