STATE of Minnesota, Respondent,

v.

Jayme Charles Frederick STARKEY,
Appellant.

No. C0–92–2109.

Court of Appeals of Minnesota.

Oct. 12, 1993.

Review Granted Nov. 16, 1993.

Hubert H. Humphrey, III, Atty. Gen., Michael O. Freeman, Hennepin County Atty., J. Michael Richardson, Asst. County Atty., Minneapolis, for the respondent.

Melissa V. Sheridan, Asst. State Public Defender, St. Paul, for appellant.

Considered and decided by CRIPPEN, P.J., and RANDALL and HARTEN, JJ.

## OPINION

HARTEN, Judge.

Jayme Charles Frederick Starkey appeals from his conviction for second degree murder, challenging the exclusion of pornographic evidence portraying violence, portions of the state's closing argument, and the post-trial court's refusal to question jurors regarding outside influence. We affirm.

### FACTS

This case involves the January 12, 1992 death of civic leader Earl Craig, Jr., age 52, director of the Minneapolis Neighborhood Revitalization Program. Starkey then age 18, claimed to have killed Craig accidentally during a struggle in Craig's townhouse.

Starkey testified that on January 12, 1992 he missed the 1:00 a.m. bus home from a video game arcade in downtown Minneapolis. After trying unsuccessfully to call for a ride, wearing a sleeveless denim jacket in fifteen degree weather, he began a two to three mile walk toward his Newton Avenue home. As Starkey walked along Hennepin Avenue, a Jeep Cherokee pulled up, and Craig, who introduced himself as "Doug," offered Starkey a ride home. After speaking with Craig for a few moments, Starkey accepted the ride. Craig instead drove to his nearby townhouse. Security card access records indicate that they arrived at the townhouse garage at 1:18 a.m. and entered an elevator two minutes later.

Starkey offers the following account of events that resulted in a confrontation in the townhouse. After picking up Starkey, Craig said he needed to go home to change clothes to attend a party. The pair then drove to Craig's townhouse where Starkey accepted a vodka drink from Craig. After some delay, Starkey became suspicious of Craig's intentions.

Craig sat next to Starkey on a couch, touched his shoulder, and asked if Starkey would remove his coat to "see what you look like." Starkey became fearful and went into a bathroom near the front door to plan his escape. As Starkey exited the bathroom, Craig approached in a hallway, naked except for a T-shirt and socks, and revealed a knife in his right hand.

At knife-point, Craig marched Starkey upstairs to the bedroom and forced him onto the bed. During a struggle on the bed Craig told Starkey he was "horny" and wanted to "bone" him. Starkey knocked the knife loose and grabbed it with his left hand. While grappling with Craig, his face almost pinned to Craig's chest, Starkey pulled his arms together to break Craig's hold and accidentally thrust the knife into the right side of Craig's neck. As Craig grabbed Starkey's arms, Starkey heard a "choking" sound, smelled blood and felt Craig's arms relax. Starkey fell back to the foot of the bed. He watched Craig bleed from the nose and mouth and eventually stop breathing. Starkey then unplugged Craig's bedside telephone.

Starkey testified that he was distressed. To calm himself and consider his options, he had a beer and listened to a rock radio station on Craig's living room stereo. Starkey admitted writing "KKK forever" on a wall in Craig's study to confuse investigators. He took Craig's leather coat, credit cards,

security card, cans of beer, condoms, car keys and $160 cash from Craig's pants. He left the townhouse at 3:27 a.m., went to the garage, and left in Craig's Jeep. Starkey drove around the remainder of the night, discarded the knife, and returned home. The police later searched the location where Starkey admitted discarding the knife, but did not find it. Starkey spent the next two days helping his stepfather move possessions to his family's new apartment in Crystal.

In the early hours of January 13, Starkey called a female acquaintance on the cellular phone in Craig's Jeep and went to her apartment. When she asked him about the Jeep, Starkey said he had won some money on a lottery ticket and paid to borrow his cousin's Jeep. Starkey called another female acquaintance and picked her up. He then called a mutual female friend and the three drove around until approximately 4:30 a.m. When the females placed calls on the cellular phone, Starkey warned them to be careful not to leave fingerprints. Starkey initially repeated the story about a cousin, but then told the females that he had taken the Jeep from a "faggot" who had passed out. One of the females testified at trial that Starkey told her he had "iced the f-cker."

Starkey returned to Craig's townhouse at 2:38 a.m. on January 14. Upon entering, he detected an unpleasant odor and viewed Craig's body to confirm that he was dead. Starkey left at approximately 4:10 a.m. taking two souvenir baseballs, beer, and liquor.

At approximately 11:00 a.m. January 14th, after receiving a call that Craig was missing from work, one of Craig's friends discovered his body. The police and medical examiner were summoned to investigate the scene. Three boxes of pornographic books and videotapes (approximately 100 items) were discovered, some depicting male homosexual rape.

From his Crystal apartment on January 16, Starkey placed a 911 call to the Crystal police. He reported that Craig's Jeep was located in his Crystal apartment parking lot and described the Jeep and its exact location. Minutes later, Starkey called 911 again and reported that a white male with long hair was the driver of the vehicle. When pressed

by the operator to assist the Minneapolis police in the Craig investigation, Starkey left his name and telephone number. The same day, the police traced the calls from Craig's cellular phone and interviewed two of the females who had been with Starkey on January 13. Starkey was arrested at his Crystal apartment late in the evening of January 16. After initially denying involvement, he admitted to having accidentally killed Craig in a struggle.

At trial, the state presented physical and circumstantial evidence to support its theory that Starkey intentionally stabbed Craig without a prior struggle. The state also argued that Starkey's testimony regarding his and Craig's movements prior to the confrontation in the front hallway was implausible and that Starkey could easily have fled from the bathroom. Craig's friends and colleagues testified that Craig was a peaceful man.

Hennepin County Assistant Chief Medical Examiner Dr. Kathryn Berg testified that the stab wound on the right side of Craig's neck was not immediately detected because of distension and that a layer of blood had flowed from Craig's mouth and nose and dried on his neck and chest. Therefore, possible natural causes of death were initially considered.

Upon further examination, however, a lateral two centimeter by one millimeter "slit-like" stab wound with no surrounding tears, bruises, or abrasions was discovered on the right side of Craig's neck. Correspondingly, beneath the wound a large hematoma was discovered under a neck muscle and the carotid artery and jugular vein were found severed. The slightly downward and forward path of the wound continued through "toward the back of the throat" and a significant volume of blood was discovered in Craig's lungs and upper digestive tract.

Berg indicated that an external force, such as a hand or pillow might have accounted for the absence of significant external bleeding directly from the wound. Berg testified that unconsciousness would have occurred within a couple of minutes of the stabbing. She testified that it appeared Craig had not

moved from the position he was in when he was stabbed, even though he would have been capable of movement for a short time. Berg testified that if Craig had been unrestrained, it would have been "easy [for him] to get off the bed."

The jury rejected Starkey's testimony that the stabbing was accidental or in self-defense and convicted him of second degree murder as set out in Minn.Stat. § 609.19(1) (1990). The trial court denied Starkey's post-trial motions and sentenced him to a presumptive prison term of 306 months. Starkey appeals on various grounds.

### ISSUES

1. Was the evidence sufficient to sustain the conviction?

2. Was the trial court exclusion of the pornographic evidence reversible error?

3. Was Starkey unfairly prejudiced by the state's closing argument, based upon its theory of the murder, and the prosecutor's personal commentary?

4. Did the post-trial court err in refusing to grant a hearing to question the jurors regarding alleged outside influence?

### ANALYSIS

■■■ Evidence is viewed "in the light most favorable to the jury's verdict," and it is assumed that "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989). A verdict will be upheld if the jury could reasonably find the defendant guilty as charged, despite the defendant's presumption of innocence and the state's burden of proving each element beyond a reasonable doubt. *State v. Alton*, 432 N.W.2d 754, 756 (Minn.1988). If circumstantial evidence is the basis for a conviction, "reasonable inferences from such evidence [must be] consistent only with defendant's guilt and inconsistent with any other rational hypothesis." *Id.* Inference is frequently essential in proving intent. *State v. Schweppe*, 306 Minn. 395, 401, 237 N.W.2d 609, 614 (1975).

■■ 1. *Sufficiency of Evidence.* Although a defendant bears the burden of pro-

ducing evidence to support a claim of self-defense, *State v. Graham*, 371 N.W.2d 204, 209 (Minn.1985), if the defense is properly raised, the state must prove the non-existence of self-defense beyond a reasonable doubt. *See State v. Bland*, 337 N.W.2d 378–381 (Minn.1983). Nonetheless, Starkey's factual account of an accident differs from his alternative self-defense claim: he claimed that the stabbing was unintentional rather than intentional but justified.

The focus of our review is whether the state proved guilt beyond a reasonable doubt in light of Starkey's defenses. The state argues that the following evidence and inferences were sufficient to prove intent and guilt beyond a reasonable doubt:

(a) The testimony of the police and medical examiner indicating the absence of evidence of a pre-stabbing struggle on the bed, as demonstrated by the intact position of Craig's fitted bedsheet. Craig's body was found in a vulnerable semi-prone position. Craig was lying on his back with his shoulders and head resting against the headboard, his right elbow leaning on the mattress. Except for one small cut discovered on Craig's right arm and Starkey's testimony that his (Starkey's) finger was cut, there was no other evidence that either Craig or Starkey was injured while warding off a knife. The state argued that Craig's body position was inconsistent with that of an aggressor attempting anal rape; it theorized that Craig was positioned on the bed anticipating consensual oral sex when Starkey approached the left side of the bed with a hidden knife and suddenly stabbed Craig.

(b) The similarity of markings made by moving Starkey's leather bracelet across fabric to duplicate bloody imprints on one of Craig's pillows and the virtual absence of blood on the lower third of the bed indicate that Starkey had subdued Craig and blocked the blood flow, perhaps with a pillow, after the stabbing. Both sides of the pillowcases were saturated with blood and extensively stained by aspirated blood droplets. Consistent with the state's theory, blood was found on the carpet and mattress edge beneath the headboard, and on the headboard in a "windshield-wiper pattern" behind Craig's head.

The state argued that the blood pattern on the headboard was inconsistent with Starkey's testimony that Craig merely "tried to sit up a bit" after having been stabbed.

(c) Starkey's claimed action of unplugging the phone after Craig was dead would serve no purpose and would make little sense, as opposed to Starkey unplugging the phone before Craig died to prevent him from summoning help.

(d) Despite opportunity, Starkey did not attempt to escape out the front door from the bathroom. It is unlikely that Craig could have gone upstairs, undressed, returned to the kitchen and grabbed a knife before Starkey exited the bathroom.

(e) The testimony of one of Starkey's female friends that Starkey told her he "iced" Craig, implied that he intentionally killed him.

(f) Starkey's thefts of property and his writing "KKK forever" on the wall after the killing are consistent with guilt.

(g) The testimony of Craig's friends and colleagues that he was a peaceful man.

■■■ The jury determines the weight and credibility of the witnesses, *Moore*, 438 N.W.2d at 108, and is "not required to credit" a defendant's exculpatory testimony. *State v. Berry*, 309 N.W.2d 777, 784 (Minn. 1981). Based on the sufficiency of the evidence presented, the jury was entitled to find second degree murder and the absence of accident and self-defense beyond a reasonable doubt.

Craig's body position and lack of blood at the foot and to the side of the bed, together with the ingested blood, indicate blockage of bleeding by an external force in order to subdue Craig and perhaps hasten his death. Starkey never asserted that he applied pressure to the wound in an attempt to save Craig's life. The wound itself showed no evidence of tearing, abrasion, or slashing that might be expected in a struggle. The medical examiner testified that the penetrating wound was not the mere "nick" suggested by Starkey's trial counsel. The lack of blood on the lower third of the mattress is inconsistent with Starkey's testimony that his arms were

bloody when he fell back to the bottom of the mattress.

Finally, circumstantial evidence showed that Starkey's version of being confronted at knife-point in the hallway adjoining the front bathroom by a semi-nude Craig was not credible. Starkey's actions after the stabbing, including the theft of property and Craig's vehicle are inconsistent with his testimony that he was confused and in shock. Instead, they demonstrate criminal motivation. *See State v. Siverhus*, 355 N.W.2d 398, 401 (Minn.1984) (intent partially inferred from evidence defendant cut telephone cord and left injured victim helpless).

■■ 2. *Exclusion of Evidence.* Starkey argues that the exclusion of the three boxes containing pornographic books, tapes, and magazines was reversible error. A trial court's evidentiary decisions are discretionary. *Siverhus*, 355 N.W.2d at 401. They will be reversed "only when [an] error substantially influences the jury to convict." *State v. Loebach*, 310 N.W.2d 58, 64 (Minn. 1981). The jury was aware that Craig was homosexual. During the trial, it heard and observed eight titles of the pornographic materials, none of which explicitly suggested violent content. No testimony regarding the content of any of the materials was allowed.

The trial court excluded remaining evidence of pornographic books and videotapes, some depicting homosexual violence, after a discussion among the parties and court concerning relevance, prejudice, and character. *See* Minn.R.Evid. 402, 403, and 404. At trial, Starkey's attorney sought to introduce the evidence as part of the complete picture of the death scene, and as relevant to the issue of self-defense. Starkey's trial counsel expressly stated that admission was not sought for the purpose of propounding a behavioral theory that pornography engenders violence. On appeal, however, Starkey goes further; he argues the very behavioral theory he eschewed at trial. He argues that the evidence was relevant "to the question of who brought the knife to this particular fight" and that the exclusion of the pornography depicting homosexual violence violates his right to due process. Starkey also now argues that the material should have been admitted to show

intent. Minn.R.Evid. 404(b); *see also Bland,* 337 N.W.2d at 382.

■ Although Starkey's stated purpose for seeking admission of the violent pornography at trial was imprecise, we believe that the trial court's evidentiary ruling was excessively restrictive and constituted an abuse of discretion to the extent that no testimony regarding violent content of the pornography was permitted. Starkey argued that this evidence was relevant to his defense. Because Starkey argued that he accidentally killed Craig while fending off an attempted rape, we believe that he should have been allowed to present evidence of the content of the pornographic materials to support his defense.

■ Some testimony regarding relevant content of the materials should have been permitted under the exception of Minn. R.Evid. 404(a)(2) (alleged pertinent character trait of victim). We do not believe that *limited* testimony as to the violent content of the materials presented a danger of unfair prejudice substantially greater than its probative value under rule 403.[1]

We also agree with Starkey that in several reported cases the admission on behalf of the state of books on satanism, pornography, and guerilla warfare to show intent or motive is based on analysis similar to this case. *See State v. Naylor,* 474 N.W.2d 314, 319 (Minn. 1991); *State v. Herberg,* 324 N.W.2d 346, 347 (Minn.1982); *State v. Hogan,* 297 Minn. 430, 433, 212 N.W.2d 664, 667–68 (1973). The reasons for admitting such evidence are at least equally compelling here.

■ It remains for us to determine whether the exclusion substantially influenced the jury's decision. *Loebach,* 310 N.W.2d at 64. Starkey argues that the exclusion was crucial to bolster his defense and prejudicial in light of the state's testimony that Craig was peaceful. The state implicitly argues that other evidence was sufficient for conviction. We believe that exclusion of testimony regarding the content of pornographic materials beyond the eight titles admitted,

although error, was harmless under the circumstances.

First, the quantum of circumstantial and physical evidence contradicts Starkey's testimony and suffices for the conviction. Second, Starkey's constitutional right to testify and recount the alleged attempted rape was not, in itself, infringed. Third, the jury was aware that Craig possessed homosexual pornography and was free to infer that Craig wanted to have sex with Starkey in some fashion. Fourth, the admission of the violent pornographic evidence at best would have only indirectly supported Starkey's defense and would still have left Starkey without any evidence of specific and relevant prior bad acts of the victim. We conclude that the exclusion was not a substantial factor in the jury's decision to convict and does not warrant a new trial.

■ 3. *Final Argument of Prosecutor.* Starkey argues that the state's theory that Craig was positioned in bed anticipating consensual oral sex when Starkey unexpectedly stabbed him is prejudicial conjecture. *See, e.g., State v. Webb,* 440 N.W.2d 426, 431 n. 3 (Minn.1989) (no factual basis for theory that defendant killed victim because she laughed at him "following a failed attempt at sexual intercourse"); *State v. Wahlberg,* 296 N.W.2d 408, 419 (Minn.1980). The state, however, "has the right to present * * * all legitimate arguments on the evidence * * * [and] all proper inferences to be drawn therefrom." *Wahlberg,* 296 N.W.2d at 419. Here, unlike *Webb,* the state's theory is a permissible inference from Starkey's testimony that Craig desired to have sex with him and from Craig's semi-nakedness, body position, and location.

■ Starkey also challenges the following statements by the prosecutor in closing argument: (a) a preemptive statement in closing argument that the defense "will try and * * * divert your attention from the real facts;" and (b) a comment on Starkey's testimony: "I mean I find that impossible to believe." As to the preemptive statement, a

---

1. In contrast, the prejudicial testimony excluded in *Siverhus,* 355 N.W.2d at 401, was more clearly excludable under rule 403 because of the greater

danger posed by a witness' speculation concerning specific observations.

prosecutor is permitted to make arguments anticipating the particular defense arguments in a case. *State v. Salitros,* 499 N.W.2d 815, 818 (Minn.1993). Broad indictments in argument condemning the "types" of arguments "defense counsel [use] in all cases" unfairly prejudice defendants, however. *Id.* The prosecutor's preemptive statement here, was limited to the arguments he anticipated and therefore was not improper. As to the statement of prosecutor's belief, an attorney's statement of personal opinion to a jury about the credibility of a witness is improper, even if as here, inadvertent. *State v. Lee,* 391 N.W.2d 46, 49 (Minn.App.1986), *pet. for rev. denied* (Minn. Sept. 22, 1986). Nevertheless, the error is harmless because there is no indication that it substantially influenced the jury. *State v. Caron,* 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974).

■■■ 4. *Denial of Schwartz Hearing.* Starkey argues that the post-trial court erred in refusing to question the jurors concerning alleged improprieties. Starkey alleges that: (a) the trial judge's law clerk pressured a juror to continue during closing arguments despite illness; (b) one of the jurors knew one of the police officers who testified (the trial court denied an earlier motion during trial to replace the juror) and other jurors expressed opinions that police officers would not lie; (c) another juror admitted to an alternate juror that during the trial she pushed the mute button on her television when a news report came on about the trial; (d) jurors were concerned about the trial extending into the Labor Day weekend; and (e) one juror allegedly admitted to an alternate juror that she was able to hear some bench conferences.

These matters were referred to another district court judge, who held a hearing to determine whether a prima facie case had been presented to question the jurors in a *Schwartz* hearing. *See Schwartz v. Minneapolis Suburban Bus Co.,* 258 Minn. 325, 104 N.W.2d 301 (1960); *State v. Butzin,* 404 N.W.2d 819, 828 (Minn.App.1987), *pet. for rev. denied* (Minn. June 9, 1987). The post-trial court determined that: (a) the law clerk simply inquired of the juror's health at the

trial judge's request; there was no evidence that the clerk pressured the juror to continue; (b) the trial court's instructions to the jurors regarding objective evaluation of the credibility of the witnesses cured any potential bias; (c) the juror who muted her television did precisely what she was instructed to do by the trial court to avoid publicity; (d) there was no evidence that any concerns the jurors may have had about the Labor Day weekend affected the verdict; and (e) there was no evidence that any juror improperly considered bench conferences. We conclude that the post-trial court's denial of a *Schwartz* hearing was proper.

**DECISION**

The evidence was sufficient for the jury to reject Starkey's claims of accident and self-defense and convict him of second degree murder beyond a reasonable doubt. Although some testimony regarding the violent content of the victim's pornography collection should have been permitted, exclusion was harmless error beyond a reasonable doubt in light of the remaining evidence. The prosecutorial comments were not unfairly prejudicial and prima facie evidence of juror misconduct was not presented.

**Affirmed.**