STATE of Minnesota, Respondent,

v.

Jayme Charles Frederick STARKEY,
Petitioner, Appellant.

No. C0–92–2109.

Supreme Court of Minnesota.

May 27, 1994.

John M. Stuart, State Public Defender, Melissa Sheridan, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael Freeman, Hennepin County Atty., J. Michael Richardson, Asst. County Atty., Minneapolis, for respondent.

## OPINION

PAGE, Justice.

Jayme Charles Frederick Starkey was convicted by a Hennepin County District Court jury of second degree intentional murder[1] for the killing of Earl Craig, Jr. The conviction was affirmed by the court of appeals, 507 N.W.2d 8. In seeking review by this court, Starkey claims the court of appeals erred in: (1) finding the evidence presented at trial sufficient to convict him; (2) concluding that the trial court's failure to admit into evidence the pornographic materials found at the crime scene was harmless; (3) finding the prosecutor did not commit prejudicial misconduct in his closing statement; and (4) upholding the trial court's refusal to question jurors under oath regarding allegations that the jury was exposed to improper information, that the law clerk improperly communicated with a member of the jury, and that juror misconduct occurred during the jury's deliberations.

On January 14, 1992, Earl Craig, Jr.'s body was discovered in an upstairs bedroom of his townhouse by a friend. Craig had not been at work for two days and had last been seen alive by friends at about midnight on Saturday, January 11. The police were called, and when they arrived, they found Craig's body upstairs in the bedroom, seated in an upright position with his back against the headboard of the bed. The area around his nose and mouth was covered with blood. He was wearing only a blood-soaked t-shirt and a pair of socks. There was blood on the bedding and on the carpet in back of the headboard. The stereo in the living room was playing hard rock music. The police found the phrase "KKK forever" written on an upstairs wall. In one of Craig's closets, the police found approximately 300 pornographic books, magazines, and movies. They found no marijuana or drug paraphernalia in the townhouse.

The medical examiner found no obvious bodily injury to Craig and no sign of a struggle in the bedroom. Craig's autopsy revealed a slit-like stab wound on the right side

---

1. Minn.Stat. § 609.19(1) (1992) (causing the death of a human being with intent to effect the death of that person or another, but without premeditation).

of his neck, with no signs of tearing that might indicate a struggle had occurred. Craig's carotid artery and jugular vein had been cut. The medical examiner found no significant external bleeding from the stab wound and theorized that an external force, such as a hand or pillow, stopped the bleeding. The blood clotted near the skin, resulting in the majority of the bleeding being internal, and in Craig swallowing a lot of blood and taking blood into his lungs. The medical examiner concluded Craig had probably lived a few minutes after being stabbed, and he would have been able to move during that time, but, apparently had not. Craig's body fluids were tested for alcohol and drugs. The test revealed a blood alcohol concentration of .05. The tests were negative for the presence of THC, the active ingredient in marijuana. The death was ruled a homicide, caused by the massive blood loss from the stab wound.

A BCA crime scene coordinator conducted a blood stain and blood splatter analysis. He concluded some sort of struggle occurred after the stabbing.

The police investigation discovered an unsuccessful attempt had been made to use Craig's cash card at approximately 2:00 a.m. on January 14 at a bank in Robbinsdale. They also found Craig's security access card had been used several times on January 12 and 14, and several calls had been made on January 12 and 13 from the cellular phone in Craig's missing Jeep to three young women—Amelia Sackariasin, Andrea LaForest, and Damian Hebert. The three women were interviewed by police and later testified at trial.

Sackariasin said Starkey had called her from a car phone late in the evening on January 12. He also visited her home that night. He told her he had won $500 on a lottery ticket and had paid his cousin $50 to rent the Jeep for the night.

Hebert told the police Starkey had called her at about 1:30 a.m. on January 13, picked her up in a Jeep, and they spent the early morning hours driving around. She said Starkey told her the Jeep belonged to his cousin. Later he told her the Jeep belonged to a man who lived at Riverplace. He indicated to her he had met the man downtown and accepted a ride from him. According to Hebert, Starkey said the man had taken Starkey to the man's house and then tried to "make a move" on him. He told her he had been scared because the man tried to kill him, but eventually the man passed out and Starkey took his car. She indicated Starkey also said he had gone back to the man's house later to get some beer and champagne.

LaForest stated Starkey and Hebert picked her up between 3:00 and 3:30 on the morning of January 13. LaForest said Starkey eventually confessed the truck was stolen. She claimed Starkey said to her that he had "iced the fucker who owned this truck." According to LaForest, a couple of days later she again rode with Starkey and he told her the man who owned the truck had offered him a ride and some beer; that they went to the man's house and got drunk; that the man, when asked to take him home, refused, and later tried to rape him.

On January 16, 1992, the Crystal Police received a 911 telephone call from an unidentified male caller who gave them the location of Craig's Jeep. Shortly after that call, the police received another call from the same individual. The caller told police he had also seen the individual who parked the Jeep. He indicated it was a white male, with shoulder-length hair, wearing a dark baggy jacket, skin tight pants, and white high-top tennis shoes. He said the Jeep had been parked at approximately 9:00 p.m. the previous Monday or Tuesday. During this second phone call the caller identified himself as Jayme Starkey and gave the dispatcher his phone number.

At approximately 11:00 p.m. on January 16, the police went to Starkey's apartment in Crystal and arrested him for probable cause auto theft. At the time of his arrest, Starkey blurted out that he knew the Jeep was stolen, but he had not stolen it. Starkey was taken to the Minneapolis homicide office where Sergeant Miles interrogated him. After being advised of his constitutional rights, Starkey waived his right to counsel and agreed to talk with Sergeant Miles who told Starkey he had been arrested for auto theft.

Starkey admitted driving the Jeep, but nothing more. Sergeant Miles asked Starkey if he had killed Craig. Starkey said he had not, but after about 10 minutes, Starkey began to cry and said he had killed Craig. Miles interviewed Starkey for approximately one hour and five minutes. When the unrecorded interview was over, Starkey was taken to another room where he gave a recorded statement which he signed.

In his statement,[2] Starkey alleged a Jeep Cherokee pulled up along side him as he was walking home from downtown Minneapolis. Craig, who was driving the Jeep, offered Starkey a ride and asked him if he wanted to "get stoned." Starkey accepted and Craig drove them to his townhouse. Inside, Craig brought out a marijuana cigarette and they both "took a couple hits." Starkey also had an alcoholic drink. Starkey put the remainder of the marijuana cigarette in an empty cigarette package he had in his coat pocket. After sitting with Craig for a while, Starkey went to the bathroom. In the bathroom, Starkey considered leaving. He opened the bathroom door, looked out, did not see anyone, and stepped back inside and closed the door. After a few minutes, Starkey stated he opened the bathroom door and saw Craig approaching him wearing only a t-shirt.[3] Craig put his hand on Starkey's shoulder, showed him a knife, and asked him to come upstairs with him. Craig put his free hand on Starkey's neck and led him upstairs to the bedroom at knifepoint. Craig made Starkey sit on the bed, sat down beside him, and told him he wanted to "bone" him. Starkey testified he understood this to mean Craig intended to have anal intercourse with him. A struggle ensued, and, according to Starkey, the knife fell from Craig's hand, Starkey picked up the knife, and then accidentally stabbed Craig in the neck. After stabbing Craig, Starkey pulled himself loose and "flew" to the bottom of the bed where he watched Craig die. When Craig stopped breathing, Starkey unplugged the telephone next to the bed. He did not call the police,

but instead, went downstairs, and sat in a chair. He also turned on the stereo to a hard rock music station, and went to the bathroom to clean the blood off his arms. He returned to the upstairs bedroom, picked up his hat from the bedroom floor and took cash from Craig's pants. Starkey went downstairs to the kitchen and drank a beer. He put on Craig's leather jacket and gloves and returned upstairs and wrote "KKK lives"[4] on the wall "to try to cover up what happened." Starkey went back into the bedroom and looked at Craig, walked downstairs, took a few beers, and left the townhouse.

Starkey drove in Craig's Jeep through downtown Minneapolis and along the way threw the knife over a bridge. According to his trial testimony, Starkey returned to the townhouse on at least one occasion to see if Craig was really dead. On the return trip to Craig's townhouse, Starkey took liquor, champagne, and three duffel bags. Overall, Starkey, in his statement, admitted taking $160 in cash, a leather jacket, two autographed baseballs, a half a case of beer, a bottle of champagne, gloves, three duffel bags, and a pouch containing credit cards.

In addition to giving the statement to the police, Starkey also testified at trial. His testimony contained some contradictory statements and some additional details. Starkey testified that when he and Craig were sitting together in the townhouse, Craig placed his hand on Starkey's shoulder and asked him if he would take his coat off so Craig could see what he looked like. Starkey claimed this frightened him because he was not gay, so he went to the bathroom to think about how to escape. Also, Starkey testified Craig followed him part of the way to the bathroom. In addition, contrary to his statement, Starkey testified that prior to leading him to the bedroom, Craig grabbed him by the collar with the same hand which was holding the knife.

---

**2.** The following account is from Starkey's statement unless otherwise noted.

**3.** At trial, Starkey testified Craig was wearing a t-shirt and socks.

**4.** Starkey actually wrote "KKK forever" on the wall.

In his appeal, Starkey first argues the evidence presented at trial was insufficient to support the jury's verdict. When sufficiency of the evidence is challenged, the court must undertake a "painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, was sufficient to permit the jurors to reach the conclusion which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). The court must "assume that the jury disbelieved any testimony which conflicts with the result it reached." *State v. Oevering*, 268 N.W.2d 68, 71 (Minn.1978). "Deference is given to jury verdicts and if the jury, giving due regard to the presumption of innocence and the state's burden of proving guilt beyond a reasonable doubt, could reasonably have found defendant guilty, the verdict will not be upset." *State v. Parker*, 353 N.W.2d 122, 127 (Minn.1984) (citation omitted). "Where a conviction is based on circumstantial evidence, the verdict will be sustained on appeal when the reasonable inferences from such evidence are consistent only with defendant's guilt and inconsistent with any rational hypothesis except that of guilt." *State v. Alton*, 432 N.W.2d 754, 756 (Minn.1988) (citation omitted).

Starkey contends the only direct evidence presented at trial showed Craig's death was accidental and the circumstantial evidence was consistent with this conclusion. The court of appeals, however, held the evidence presented at trial was sufficient for the jury to find Starkey guilty of second degree murder. We agree.

Starkey's testimony was the only support for his version of Craig's death. The jury did not have to believe Starkey. The jury decides the level of credibility to assign a witness, *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989), and need not credit a defendant's exculpatory testimony. *State v. Berry*, 309 N.W.2d 777, 784 (Minn.1981).

Our review of the evidence convinces us there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Starkey intentionally killed Craig. In addition, Starkey's account of his actions both before and after the killing cast doubt on his credibility and support the jury's finding of an intentional murder. First, while Starkey contended the killing took place during a struggle, ample evidence indicated no struggle occurred before the stabbing. The fitted bed sheet remained in place, Craig suffered no significant injury to his hands or arms, and the stab wound itself lacked any tearing that might indicate a struggle. Starkey also testified that after accidentally stabbing Craig, Craig held Starkey's arms for a moment, and then Starkey fell back to the bottom of the bed. However, this version of what took place is inconsistent with the accumulation of blood within Craig, which, according to the medical examiner, was likely caused by pressure being applied to the stab wound, possibly by a hand or pillow. Further, the blood spatter analysis conducted by the BCA indicated more of a struggle after the stabbing than Starkey described.[5]

According to Starkey, Craig provided the marijuana cigarette they shared at the townhouse. Yet no THC was found in Craig's body and no marijuana or drug paraphernalia was found in the townhouse. Starkey also testified he wanted to leave the apartment after Craig "came on" to him. Nevertheless, Starkey failed to do so even though it appears that when he first looked out of the bathroom he could have escaped without the risk of injury.

Starkey's conduct after the stabbing suggests he had criminal intent. *See State v. Silverhus*, 355 N.W.2d 398, 401 (1984) (intent to kill partially inferred by conduct occurring after killing). Starkey unplugged the telephone next to Craig's bed, wrote "KKK forever" on a wall to mislead police investigators into thinking a white supremacist had committed the crime, reported finding Craig's Jeep and identified its driver as a white male, again to mislead police investigators, and stole some of Craig's property, including the Jeep, $160 in cash, autographed baseballs, a leather jacket, gloves, beer, champagne, credit cards, and duffel bags.

---

5. In addition, the crime scene coordinator found patterns of blood on the headboard and pillow of Craig's bed. The patterns could have been made by a bracelet Starkey had in his possession.

Based on our analysis of the evidence in the record and given that the jury did not have to believe Starkey's testimony, we hold the evidence was sufficient for the jury to find Starkey guilty beyond a reasonable doubt of murder in the second degree.

Next, we consider Starkey's claim that the trial judge wrongly excluded certain evidence. The defense knew that at trial the prosecution would introduce testimony indicating Craig was a nonaggressive, passive individual. To rebut this characterization and support its theory of the case, the defense sought to introduce three boxes filled with pornographic books, magazines, and 8 mm films which had been found in Craig's townhouse. They alleged the pornography included material featuring young men being forcibly raped by older men and other violent homosexual acts.[6] The defense first moved to admit a list of the titles of the pornographic items. The prosecutor opposed the motion on grounds of relevance and because the resulting prejudice and confusion would substantially outweigh any probative value of the list. The defense then withdrew its motion with respect to the list and made a new motion seeking the admission of all the pornographic material, arguing the material would bolster Starkey's claim of an accidental killing. The following discussion of the motion ensued:

> DEFENSE COUNSEL: Basically what the defendant is trying to show is this was in the house, some of which was at bedside * * *. Some of those particular boxes do involve exploitation of young men, all of which, or 99.9 percent of these boxes were all gay orientated and basically were exploitative of young men. This is a long ways from our original motion of talking about a predator, about a pedophile. Basically it just shows the lifestyle. I don't believe they should be excluded from the jury because it's very, very much relevant.

> \*    \*    \*    \*    \*    \*

> THE COURT: * * * how is that not in essence backdooring my rulings as to the character of the victim and what's admissible in the trial?

> DEFENSE COUNSEL: * * * What was found in that particular apartment, including a messy apartment, the knives, the condoms and everything else is all a jury question. The relevance is for the jury to determine * * *. This is the death scene. We're not talking about what happened the night before, whether he cruised or didn't cruise, whether he exploited or didn't exploit. We're just showing what was in that particular house.

> \*    \*    \*    \*    \*    \*

> THE COURT: How does the fact that he had pornographic books or magazines in his apartment, how is that probative of whether or not Mr. Starkey acted with intent or that he acted in self-defense?

> DEFENSE COUNSEL: The issue in this particular case, Your Honor, is not just that second degree murder happened. Was it intentional? Was it self-defense? It's the entire, it's the entire factual scene. I mean the state is going to be able to bring in through many of their witnesses how they knew Earl Craig, what type of individual Earl Craig was, that he was known to be peaceful, that he was nonviolent. I'm not trying to argue the Duworski [sic] theory that pornographic magazines make you violent or nonviolent. There is that theory out. I believe it's Andre [sic] Duworski, a professor at the University. I'm not doing that. I just believe that what was found was found, whether it's knives, whether it's dirty linen, whether it's trousers, that was there. It's for the

**6.** Of the eighty-seven magazines found in the boxes, nine arguably contain pictures of violent homosexual sex acts, and six contain pictures of heterosexual sex acts. Of the 204 paperback books, seventeen appear to involve themes of homosexual rape and violent sex. Ten books involve heterosexual sex, of which two appear to involve forced sex. Cover boxes for the six 8 mm films suggest two involve homosexual acts while four depict heterosexual acts. Thus, twenty-six out of 297 items contain depictions of arguably violent homosexual acts while the remainder appear to involve either non-violent homosexual acts or heterosexual acts. No item appeared to be a blueprint for the attack Starkey claims Craig made on him the night of the killing. Most of the books and magazines are old, bearing publication dates in the 1970s, but a few are from the late 1980s.

jury to determine after they hear all of the evidence.

Later, the court refused to admit either the list of titles or the collection itself.

> THE COURT: As to the three-page list of titles or the actual exhibits themselves, I am not going to allow the list or the exhibits to be brought in as evidence. What I am going to allow is some reference to be made by the defense on cross-exam, presumably the police officers, that there were some items of books and magazines found in the apartment. I'm not going to allow any mention of any specific titles or the quantities that were involved.

> \*   \*   \*   \*   \*   \*

> But I'm not going to allow specific references to be made to any titles or to any quantities that are involved. So it's somewhat limited in scope but I'll allow reference to be made as to what was found in the apartment.

> DEFENSE COUNSEL: \* \* \* We'd ask that you reconsider for the following reasons. The three page document we're talking about—I believe Ms. Olkon gave you a copy of such and Mr. Streitz has had since last Friday—references are made to numerous publications that involve teenagers, that involve rape, that involve the type of conduct that the defendant alleges happened, in other words an attempted rape. I believe it is very relevant in view of the defendant's self-defense theory here.

While not changing its ruling, the court again revisited the issue.

> THE COURT: \* \* \* I'm going to modify my order somewhat relative to videos and magazines and books found in the apartment. I had ruled the other day that there could be no reference to specific titles or to the number of books found in the apartment. In reviewing the state's

video, there's a close-up of a couple boxes of books and it zeros in on some items that are on top there. I will allow the defense to make some limited inquiry to the fact that, should the defense desire, that there were numerous books, magazines, videos found in the apartment that filled up a couple, two, three boxes, whatever the case may be. They're clearly apparent from the video and I think you should be allowed limited inquiry into that without getting into specifics.

Ultimately, the trial court ruled the pornography inadmissible but permitted the defense on cross-examination to question a police officer witness about the eight titles [7] visible in the videotape of Craig's apartment. Furthermore, the defense was permitted to refer to the materials as "pornographic." The court did not allow any inquiry into the content of the material.

The court of appeals found this decision of the trial court "excessively restrictive[,] constitut[ing] an abuse of discretion to the extent that no testimony regarding violent content of the pornography was permitted." *State v. Starkey*, 507 N.W.2d 8, 14 (Minn. App.1993). The court of appeals held that some testimony of the material's violent content would have supported Starkey's defense and should have been admitted under Minn. R.Evid. 404(a)(2).[8] Although the court of appeals determined that excluding this testimony was error, the court concluded the error was harmless.

Before us, the defense characterizes some of the books as featuring stories of violent sexual acts, including homosexual rape, and argues "Craig's prurient interest in violent rape fantasies made it much more probable he attempted to act out one of those fantasies by forcing a teenager—Starkey—to have sex at knifepoint." In his brief, defendant ar-

---

7. The titles visible in the videotape are: *Hog Girl, Gay Navy Blue, Case Book: Teen Sex, Sixteen Color, Love Mouth, Hot Gay, ST, Come Nine.*

8. The general rule announced by Minn.R.Evid. 404(a) is that "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." One exception

to the general rule of exclusion is Minn.R.Evid. 404(a)(2), which permits:

> Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor.

gues the material should be admissible under either Minn.R.Evid. 404(a)(2), as proof of Craig's violent character, or 404(b) to prove Craig had the motive and intent to rape Starkey.[9] At oral argument, however, the defendant argued the pornography is admissible as relevant evidence under Minn. R.Evid. 402 and disavowed reliance on Rule 404. Because we find the pornography not relevant to any issue in the case, and because the defendant waived his Rule 404 argument, we do not address the Rule 404 concerns. We note, however, Starkey's assertion that Craig fantasized about violent rape has no support in the record except what Starkey infers from Craig's possession of the pornography.

■ Trial court decisions on the admission of evidence are reviewed under an abuse of discretion standard that is deferential to the trial court ruling. *State v. Kelly*, 435 N.W.2d 807, 813 (Minn.1989). Under Rule 402, all relevant evidence is admissible and "[e]vidence which is not relevant is not admissible." Rule 403 permits a trial judge to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury * * *."

■ At trial, Starkey argued the evidence was relevant to show Craig's lifestyle. Starkey made the bald assertion that Craig attempted to rape him and that Craig's possession of pornographic books, magazines, and films makes it more likely Craig behaved as Starkey said he did. Defense counsel at trial, however, did not seek to bolster the oral motion to introduce the pornography with any expert testimony or scientific studies. Indeed, the defense disavowed theories causally relating possession of pornography with the commission of violent sexual acts. Further, the defense did not direct the trial court to any specific pornographic materials as illustrative of any defense theory. Final-

ly, the pornographic materials were never presented to the trial court for its review.

Although the defense insisted the pornographic materials were relevant, the defense would have required the jury to wade through all of the materials to determine on its own just which, if any, were relevant. We simply fail to see how delivering the pornographic items to the jury, without more, would shed any light on the truthfulness of Starkey's version of the events leading to Craig's death. No evidence in this record indicates Craig ever engaged in sexual violence, ever talked about engaging in sexual violence, or ever expressed an interest in engaging in sexual violence. Put another way, there was no proof nor even an offer of proof to link Craig's "viewing with doing."

On appeal, Starkey again asserts admitting the pornography would have bolstered his defense. Contrary to his argument at trial, here he refers to studies he claims support the position that Craig's possession of violent pornography makes it more likely Craig would commit a violent sexual attack. Whatever those studies may, or may not, prove, we will not say the trial court erred in failing to consider specific theories not raised at trial, but instead raised for the first time on appeal. *State v. LaBarre*, 292 Minn. 228, 195 N.W.2d 435 (1972) (holding criminal defendant could not challenge scope of search warrant and justification for nighttime search for first time on appeal).

In support of his claim for the admissibility of the pornography, Starkey cites three cases where books were admitted which supported allegations concerning the defendants' motives or methods related to the conduct charged. In *State v. Naylor*, 474 N.W.2d 314 (Minn.1991), the defendant, a member of a satanic cult, was convicted of the ritualistic slaying of a fellow cult member. After review, the trial court admitted twelve books on satanism and witchcraft. With the exception of one book, we found the books relevant and properly admitted.[10] The books proper-

9. Minn.R.Evid. Rule 404(b) prohibits evidence of other crimes, wrongs, or acts "to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan,

knowledge, identity, or absence of mistake or accident."

10. We found the admission of one of those books an abuse of discretion because language in the

ly admitted corroborated testimony of codefendants. Codefendants testified that, together with the defendant, they were members of a group interested in satanism and witchcraft, that the defendant had described himself as a warlock, and had discussed his interest in witchcraft, that at least one of them had discussed books on witchcraft with the defendant, that they participated with defendant in the killing, and that the killing had its origins in an initial plan to perform a "warlock test" on the victim. The books were relevant insofar as they confirmed testimony as to the interest of the defendant and other members of the group in the practices of satanism and witchcraft, relevant in that they could help the jury understand such practices, and relevant in that they had been found in a car owned by one of the perpetrators of the crime.

Starkey also claims *State v. Herberg*, 324 N.W.2d 346, 347 (Minn.1982), and *State v. Hogan*, 297 Minn. 430, 212 N.W.2d 664, 667 (1973), support admission of the pornographic items. They do not. In *Herberg*, pornographic books depicting violent sex acts similar to those performed by the defendant on the victim were admitted into evidence. However, the admission of these items was not challenged on appeal. The court made only a passing reference to the books, suggesting a link between the contents of the books and the defendant's sado-masochistic sexual assault on a 15–year–old female. The court did not discuss or engage in any analysis of the admissibility of the books. Thus, the *Herberg* case does nothing more than support the notion that books establishing a link between "viewing and doing" may be admitted under some circumstances.

In *State v. Hogan*, 297 Minn. 430, 212 N.W.2d 664, 667 (1973), two books on urban guerilla warfare and a pamphlet on bombmaking belonging to a defendant accused of bombing a store were admitted. The books and pamphlet were found in the defendant's room in the house where he lived, along with components for making a bomb and clothing similar to that worn by an unknown suspect in a previous bombing. In addition, there was evidence that the bombs the defendant was accused of planting were of the same design as the one described in the bombmaking pamphlet. As in *Herberg*, the admission of this material was not challenged on appeal and the court neither discussed nor analyzed its admissibility. The court's decision in *Hogan* does not lend Starkey's argument any support.

As we noted in *Naylor*, "[t]here is no per se rule barring admission of books to juries in criminal trials." *Naylor*, 474 N.W.2d at 319. But, simply because books, magazines, or films have been admitted in some criminal trials does not mean that such items should be admitted in every trial. And similarly, simply because books on satanism and witchcraft were admitted in a trial involving those issues, or simply because books and magazines containing depictions of violent sex acts were admitted in a trial involving a violent sexual crime, it does not follow that materials categorically related to the crime charged are automatically relevant. As we stated in *Naylor*, "[b]ecause a book may contain much irrelevant and even potentially prejudicial material, the proponent of a book as an exhibit has a particular obligation to be familiar with its contents before offering it as evidence." *Naylor*, 474 N.W.2d at 319. Here, it does not appear the defendant satisfied this obligation. Defendant failed to point to specific items in Craig's collection of pornography and to establish their relevance to Starkey's version of the killing, or to explain how they corroborated other evidence presented at trial. Had he done so, those items might have been relevant and thus admissible, assuming under Minn.R.Evid. 403 their probative value was not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury * * *." [11] In addition, the jury should not be required to sift through boxes of materials to locate something that might be relevant. On the basis of what was before the trial court, we cannot say the court abused its discretion in refusing to admit the

book exhorted jurors to convict satanists accused of crimes. *Id.* at 319.

11. Arguments as to the prejudicial impact of the pornography were not developed in the record.

pornographic materials.[12]

Because we reverse the court of appeals' holding that the trial court erred by not admitting the pornography, we need not reach the issue of whether its exclusion was harmless error. It is not evident that the court of appeals, however, properly considered whether the exclusion was harmless error. First, like the trial court, it appears from the record the court of appeals did not examine the pornographic materials. It is impossible to assess the impact of the excluded evidence on the jury without looking at it.

■ Second, the court of appeals appears to have used the wrong standard in its harmless error analysis. In reaching its conclusion, the court of appeals reasoned the error was harmless, in part, because the evidence presented was sufficient to convict Starkey. The test for whether evidence was erroneously admitted is "whether there is any reasonable doubt the result would have been different if the evidence had not been admitted." *State v. Naylor*, 474 N.W.2d 314, 319–20 (Minn.1991) (citing *State v. Blasus*, 445 N.W.2d 535, 540 (Minn.1989)). It is a small logical step from this test to the test for excluded evidence, which is "whether, assuming that the damaging potential of the [excluded evidence] were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). Whether the evidence was sufficient to convict Starkey is a far lower standard.

Starkey next contends he was denied his right to a fair trial because of prosecutorial misconduct, primarily due to the prosecutor arguing a theory of the case not substantiated by the evidence. A prosecutor may not "seek convictions at any price." *State v. Salitros*, 499 N.W.2d 815, 817 (Minn.1993). A prosecutor must guard the "rights of the accused" as well as "enforce the rights of the public." *Id.* (quoting I ABA Standards for Criminal Justice, The Prosecution Function 3–1.1 and Commentary at 3.7 (2 ed. 1979)).

In closing argument, the prosecutor has "the right to present to the jury all legitimate arguments on the evidence, to analyze and explain the evidence, and to present all proper inferences to be drawn therefrom." *State v. Wahlberg*, 296 N.W.2d 408, 419 (Minn.1980) (citation omitted). The prosecutor may not offer theories only marginally supported by the record. *See State v. Walsh*, 495 N.W.2d 602, 606 (Minn.1993) (citation omitted). Based on our review of the prosecutor's closing argument, we do not find anything which rises to the level of prosecutorial misconduct.

■ Starkey also objects to statements of the prosecutor which allegedly disparaged the role of defense counsel and asserted the prosecutor's personal opinion concerning the credibility of a witness. The first statement reads:

> Now when I'm done talking to you the defense has an opportunity to get up and give their summation. I'm not totally sure what they're going to tell you, but I can anticipate that one of things they will try and do is divert your attention, divert your attention from the real facts, the real logic and the real common sense of this case.

In the context of this trial, this statement was not error. The statement properly calls into question an anticipated defense argument, which was in fact made. *State v. Salitros*, 499 N.W.2d 815 (Minn.1993). Defense counsel in its closing argument described Craig as a liar, pervert, and rapist, and also compared him to other public figures who have been accused of improper conduct.

---

12. Because the record does not contain an explicit statement of the trial court's reasons for not admitting the pornography, one could speculate the court acted to protect Craig's reputation at the expense of Starkey's right to a fair trial. If we had found the pornography relevant and exculpatory and had determined its probative value was not substantially outweighed by its prejudicial affect on the jury, we would not hesitate to find an abuse of discretion by the trial court, reverse conviction, and require a new trial. Based on the record before us, we cannot say whether that was or was not the case here. Irrespective of the trial court's reasoning, we can say with certainty the trial court's decision did not infringe on Starkey's rights because the pornography was not relevant.

■ At another point in his closing argument, the prosecutor asserted his personal opinion of Starkey's credibility saying "I mean, I find that impossible to believe that, if that is in fact the fact." Although the prosecutor's statement was inappropriate, we do not believe it was prejudicial. *State v. Parker,* 353 N.W.2d 122, 128 (Minn.1984).

Starkey's last basis for seeking a new trial concerns the trial court's refusal to grant him a *Schwartz* hearing pursuant to Minn. R.Crim.P. 26.03, subd. 19(6) (1992).[13] After sentencing, Starkey claimed that the jury had been exposed to improper information, that a law clerk had improperly communicated to a juror, and that juror misconduct had occurred during deliberations. Thus, he argued he was deprived of a fair trial and moved for a *Schwartz* hearing.

■ Before a *Schwartz* hearing must be ordered, the defendant must establish a *pri-*

*ma facie* case of jury misconduct, evidence which "standing alone and unchallenged, would warrant the conclusion of jury misconduct." *State v. Larson,* 281 N.W.2d 481, 484 (Minn.1979), *cert. denied,* 444 U.S. 973, 100 S.Ct. 467, 62 L.Ed.2d 388. Chief Judge Kevin Burke, who heard the motion, found Starkey had failed to establish a *prima facie* case of jury misconduct. Our examination of the record leads us to the same conclusion. Therefore, we conclude, as did the court of appeals, that the denial of the *Schwartz* hearing was proper.

Affirmed.

---

13. In *Schwartz v. Minneapolis Suburban Bus Co.,* 258 Minn. 325, 104 N.W.2d 301 (1960), this court outlined the proper procedure to use to impeach a verdict and Minn.R.Crim.P. 26.03, subd. 19(6) codifies this procedure for criminal cases.